**STATE of Maine**

v.

**Sebastian J. DIGNOTI.**

Supreme Judicial Court of Maine.

Argued June 11, 1996.

Decided Aug. 7, 1996.

---

R. Christopher Almy, District Attorney, Jeffrey Silverstein (orally), Assistant District Attorney, Bangor, for the State.

Daniel A. Pileggi (orally), Gross, Minsky, Mogul & Singal, P.A., Bangor, for Defendant.

Before GLASSMAN, CLIFFORD, RUDMAN, DANA, and LIPEZ, JJ.

GLASSMAN, Justice.

Sebastian J. Dignoti appeals from the judgments entered in the Superior Court (Penobscot County, *Mead, J.*) on his conditional plea of guilty, M.R.Crim.P. 11(a)(2), to aggravated trafficking in schedule W drugs in violation of 17–A M.R.S.A. § 1105(1)(C) (Supp.1995) and receiving stolen property in violation of 17–A M.R.S.A. § 359 (1983). Dignoti contends the court (*Mills, J.*) erred by denying his motion to suppress from any trial of the charges against him all evidence resulting from the execution of search warrants issued on January 18 and January 26, 1995. Finding no error in the record, we affirm the judgments.

The record discloses the following pertinent facts: At approximately 1:45 a.m. on January 18, 1995, Jonathan Richards, an agent of the Maine Drug Enforcement Agency (MDEA), applied for a warrant to conduct a nighttime search of the "residence and premises" of Sharman Walsh located in East Holden. In support of the warrant application, Richards executed an affidavit stating that he had "probable cause to believe and I do believe" that scheduled drugs, including cocaine, and other specified items related to the trafficking of scheduled drugs, were located at the Walsh residence. As the basis for this probable cause belief, the affidavit recites the following pertinent "facts and circumstances": In October 1994, during separate interviews of two individuals named in the affidavit, officers of the Dover–Foxcroft Police Department learned that Dignoti was selling cocaine at his residence and business in Kenduskeag. In December 1994, another named individual, arrested on a drug-related charge, informed Robert Hutchings, an agent of the MDEA, that evidence of cocaine could be found in a particular apartment located on Essex Street in Bangor.

On January 2, 1995, Hutchings met with an individual designated by the affidavit as a "concerned citizen," and another individual designated as a "cooperating defendant," who related to him that a number of people, including Sharman Walsh and Reginald Tinkham, either purchase cocaine from Dignoti or aid Dignoti in the sale thereof. Two days later, Hutchings learned from the "concerned citizen" that Sharman Walsh is a girlfriend of Dignoti, that she had lived in the Essex Street apartment identified by the named informant as containing evidence of cocaine, and that Walsh and Dignoti were presently residing in a mobile home located "between Holden and Eddington." The "concerned citizen" provided detailed information regarding Dignoti's trafficking of cocaine and informed Hutchings that Walsh sells cocaine for Dignoti and "keeps [Dignoti's] books for him" at the mobile home residence.

On January 6, after being informed by the "concerned citizen" that a person believed to be an associate of Dignoti was at the residence of Walsh, Hutchings conducted a surveillance during which he observed the alleged associate's vehicle travel from the Walsh mobile home to four separate residences in less than a two-hour time period. Also on January 6, another agent of the MDEA, Ron Gastia, directed a controlled purchase of cocaine from Reginald Tinkham and, as a result, learned that Dignoti was Tinkham's "source of supply for cocaine." On January 17, after a second "concerned citizen" informed Hutchings that on five occasions between January 9 and January 15 he had gone to the Walsh mobile home with other individuals to purchase cocaine, MDEA agents successfully conducted a controlled purchase of cocaine at the Walsh residence.

The District Court (*Gunther, J.*) issued a warrant authorizing a nighttime search of the East Holden "residence and premises" of Walsh for scheduled drugs, drug paraphernalia, business records, sums of money related to the purchase and/or sale of scheduled drugs, and "[e]vidence demonstrating identity, possession, dominion, custody or control by any and all individuals over/in the premises . . . ."

At approximately 3:00 a.m. on January 18, Richards and other law enforcement officers knocked on the door of Walsh's mobile home and announced that they had a search warrant. After repeatedly knocking on the door and hearing "a scurrying going on inside," the officers forced their way into the residence and located Dignoti in the bathroom with the front of his clothing soaking wet, the bathroom floor covered with water, the toilet running, a paper bag on the floor, and a "small white film substance ... in the water in the toilet." After arresting Dignoti and Walsh, the officers searched for, and seized, numerous items on the premises, including a loaded handgun, a "white powder residue" on the kitchen table, marijuana, various drug paraphernalia and money. After securing the services of a backhoe operator to excavate the septic tank in the backyard of the premises, the officers also seized approximately thirty grams of cocaine packaged in twenty-seven individual ziplock bags.

During the search of a detached garage located on the premises, Christopher Grotton, an officer of the Maine State Police, observed commercial construction equipment, including a Bostich air compressor, several pneumatic nail guns and a table saw, together with an outboard motor and a chain saw. Suspecting the items to be stolen property, Grotton recorded their serial numbers and, in the course of doing so, moved a majority of the items. He brought the equipment to the attention of Ken MacMaster, an MDEA agent, who, after it had become light outside, moved the items to the

driveway where they were photographed and thereafter returned to the garage.[1]

On January 26, 1995, Richards applied for a warrant to search the detached garage of the Walsh residence and seize the items that had been observed and photographed during the January 18 search. In support of the application, Richards executed an affidavit stating that Grotton had conducted an investigation, using the photograph taken by MacMaster during the January 18 search, and had determined that the items located in the garage of the Walsh residence were stolen property. In execution of a warrant for a daytime search issued by the District Court (*Russell, J.*), Richards seized a table saw.

Following the institution of the present charges against him, Dignoti entered pleas of not guilty as to each count and filed a motion to suppress all evidence obtained as a result of the January 18 and 26 searches. After a hearing, the trial court denied the motion. Dignoti withdrew his pleas of not guilty and, pursuant to M.R.Crim.P. 11(a)(2), entered conditional pleas of guilty to the charged offenses. From the judgments entered accordingly, Dignoti appeals.

I

■ Dignoti first contends that because the affidavit executed in support of the January 18 warrant for the search of the East Holden premises was insufficient to support a finding of probable cause, the issuance of that warrant violated his rights guaranteed by the federal and Maine Constitutions to be free from unreasonable searches and seizures.[2] We disagree.[3]

---

1. MacMaster testified that he moved the items outside because he had no flash on his camera and the lighting in the garage was insufficient to photograph the items.

2. Amendment IV to the United States Constitution, made applicable to the states by Amendment XIV, provides:

    **Searches and seizures**
    The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

Article 1, Section 5 of the Maine Constitution provides similar protection against unreasonable searches and seizures.

3. Because we conclude that the January 18 affidavit alleges sufficient facts to support a finding of probable cause and alleges that the evidence easily could be destroyed, transferred or removed from the premises, we reject Dignoti's contention that the District Court improperly authorized a nighttime search. *State v. Ward*, 624 A.2d 485, 486 n. 1 (Me.1993) (" 'Reasonable cause exists for a night search when the warrant and affidavit assert a positive belief, supported by probable cause, that the evidence to be seized will be at the person's home and further disclose that the evidence is capable of being altered, moved, or destroyed on short notice.' ") (quoting *State v.*

■ We review the District Court's finding of probable cause directly and in doing so "must read the affidavit 'with all reasonable inferences that may be drawn to support the [District Court's] determination.'" *State v. Ward,* 624 A.2d 485, 487 (Me.1993) (quoting *State v. Lutz,* 553 A.2d 657, 659 (Me.1989) (citation omitted)). Further, we have stated that

> in keeping with the deference to be accorded the decision of a neutral magistrate to issue a search warrant, the affidavit should be read *positively* to determine whether it can fairly be read to support the complaint justice's action. [B]oth magistrates and courts must test the affidavit "in a common sense and realistic fashion.... Technical requirements of elaborate specificity once exacted under common law pleadings have no proper place in this area."

*Id.* (citations omitted).

■ We find no merit in Dignoti's contention that because the affidavit contains no statement concerning the veracity and reliability of the unnamed individuals designated as "concerned citizens," it is insufficient to establish probable cause. As we stated in *Ward,* 624 A.2d at 488, "an 'informant's reliability is not, under the *Gates* test, to be considered as an element separate and apart from the general inquiry whether the affidavit as a whole establishes a sufficient basis for the complaint justice to find probable cause.'" (quoting *State v. Knowlton,* 489 A.2d 529, 532 (Me.1985) (adopting decision of Supreme Court in *Illinois v. Gates,* 462 U.S. 213, 230, 103 S.Ct. 2317, 2327, 76 L.Ed.2d 527 (1983) (reaffirming totality-of-circumstances test and stating that "an informant's 'veracity,' 'reliability,' and 'basis of knowledge' are ... elements [that] should [not] be understood as entirely separate and independent requirements to be rigidly exacted in every case ...")))). Here, the affidavit discloses that the investigating officers corroborated important facts alleged by the unnamed "concerned citizens." Furthermore, the admission against his penal interests by the second "concerned citizen" that on five occasions between January 9 and January 15 he had gone to the Walsh mobile home to purchase

cocaine "'serve[s] to corroborate and reinforce the underlying factual assertions.'" *Ward,* 624 A.2d at 488 (quoting *Knowlton,* 489 A.2d at 532 n. 1 (citation omitted)). Accordingly, viewing the affidavit in the appropriate deferential light, we conclude that "a substantial basis exists in support of the District Court's finding of probable cause." *Id.*

## II

■ Dignoti next contends that by excavating the septic tank located in the backyard of the Walsh premises, the officers conducted a search that exceeded the scope of the warrant. We disagree.

■ "We review the search and seizure of evidence for constitutional adequacy *de novo.*" *State v. Pelletier,* 673 A.2d 1327, 1329 (Me.1996) (citation omitted). Here, consistent with the requirement that a warrant designate "the person or place to be searched," M.R.Crim.P. 41(c), the search warrant at issue states in pertinent part as follows:

*Place(s) or person(s) to be searched:*

The residence of Sebastian Dignoti and Sharmin [*sic* ] Walsh, residence and premises located on the Mann Hill Road in the Town of East Holden, County of Penobscot, State of Maine. Residence and premises more fully described as:

> A single family, one story structure which is a mobile home which has had additional rooms built onto it, being white in color with red trim along with red shutters. The mobile home has a "KEEP OUT" sign attached to a tree located in front of the front entry porch, along with an unattached garage which is also white with red trim. Said premises being physically located on the Mann Hill Road, two tenths of a mile from the intersection of the Bagaduce Road and the Mann Hill Road, on the left headed east on Mann Hill Road, along with any and all vehicles and persons that may be found upon said premises at the time of warrant execution or

*Salley,* 514 A.2d 465, 467 (Me.1986) (citations omitted)).

who may arrive upon said premises, with the exception of people who may arrive upon or be upon said premises in a regular course of business, ie postman, delivery people.

Contrary to the contention of Dignoti that the warrant limits the scope of the search to the mobile home, the detached garage, and persons and vehicles on the premises, we conclude that the warrant's description "makes it possible for drug agents to identify with reasonable effort and reasonable certainty the premises to be searched," *Pelletier*, 673 A.2d at 1329, and that those "premises" include the backyard area in which the septic tank is located. *See United States v. Griffin*, 827 F.2d 1108, 1115 (7th Cir.1987), *cert. denied*, 485 U.S. 909, 108 S.Ct. 1085, 99 L.Ed.2d 243 (1988) (seizure of contraband from soil and rock in backyard of premises did not exceed scope of warrant authorizing search of *"the premises* known as one red, one story framed house with white trim at 5311 East 13th Avenue, Gary, Indiana, with a detached garage, red with white trim"; specific reference to "house" and "garage" did not limit scope of search to those structures, but instead made premises to be searched more readily identifiable); *State v. Brochu*, 237 A.2d 418, 420, 423 (Me.1967) (seizure of evidence found in detached garage did not exceed scope of warrant authorizing search of *"the premises* known as the dwelling of Armand A. Brochu located at 20 Forest Street, ... said *premises* being owned/occupied by Armand A. Brochu"; inclusion of clause "known as the dwelling of Armand A. Brochu" did not "limit the breadth of 'premises at 20 Forest Street' to the dwelling house proper") (emphasis added).

■ Accordingly, because the septic tank was within the scope of the authorized search, and because the officers reasonably could suspect that cocaine would be located therein, the search was not unreasonable. *See United States v. Ross*, 456 U.S. 798, 820–21, 102 S.Ct. 2157, 2170–71, 72 L.Ed.2d 572 (1982) ("A lawful search of fixed premises generally extends to the entire area in which the object of the search may be found and is not limited by the possibility that separate acts of entry or opening may be required to complete the search."); *United States v. Giannetta*, 909 F.2d 571, 577 (1st Cir.1990) ("Any container may be searched if it is reasonable to believe that the container could conceal the object of the search.") (citing *United States v. Doherty*, 867 F.2d 47, 65–66 (1st Cir.), *cert. denied*, 492 U.S. 918, 109 S.Ct. 3243, 106 L.Ed.2d 590 (1989)) (other citation omitted).

### III

■ Dignoti next contends that by moving the equipment found in the garage, Officers Grotton and MacMaster conducted a search for items that were not within the scope of the warrant's authority. He argues that because the officers lacked the requisite probable cause to believe the equipment was evidence of criminal activity, the warrantless search of the items cannot be upheld as legal pursuant to the "plain view" doctrine. We disagree.

■ The officers' movement of the items found in the garage, which we agree constitutes a search that exceeded the scope of the warrant's authority, nonetheless is valid "if the 'plain view' doctrine would have sustained a seizure of the equipment." *Arizona v. Hicks*, 480 U.S. 321, 326, 107 S.Ct. 1149, 1152, 94 L.Ed.2d 347 (1987). It is well settled that a warrantless seizure of incriminating evidence is permitted when the following three conditions are met:

First, the officer[s] must not have violated the Fourth Amendment in arriving at the place in which the evidence is in plain view. Second, the incriminating character of the items to be seized must be immediately apparent. Third, the officer[s] must have a lawful right of access to the items.

*State v. Kennedy*, 645 A.2d 7, 8 (Me.1994) (citations omitted). We conclude at the outset that because the issuance of the warrant was valid and provided a lawful right of access to the items, the first and third requirements are met. As to the second part of the test, "[t]he 'immediately apparent' requirement is satisfied if police have probable cause to associate the discovered items with criminal activity." *Kennedy*, 645 A.2d at 8 (citations omitted). The First Circuit Court

of Appeals has described probable cause, in the context of plain view seizures, as follows:

> Probable cause to support a plain view seizure requires more than "hunch, guesswork, and cop-on-the-beat intuition," but less than proof beyond a reasonable doubt or a "near certainty" that the seized item is incriminating. There must be enough facts for a reasonable person to believe that the items in plain view may be contraband or evidence of a crime. A "practical, nontechnical" probability that incriminating evidence is involved is all that is required.

*Giannetta*, 909 F.2d at 579 (citations omitted). *See also State v. Bradley*, 658 A.2d 236, 237 (Me.1995) (quantum of proof necessary to establish probable cause less than fair preponderance of evidence). We have previously stated: "Probable cause exists when the officers' personal knowledge of facts and circumstances, in combination with any reasonably trustworthy information conveyed to them, would warrant a prudent person to believe that the items to be seized are evidence of a crime." *Kennedy*, 645 A.2d at 9 (citation omitted). We will reverse the trial court's determination of probable cause only if it is clearly erroneous. *Id.*

At the hearing on Dignoti's motion to suppress, Grotton testified that the items in the garage caught his attention because they "didn't seem to fit with the rest of the garage." Specifically, the items were "stacked up in a pile ... as though they'd been kind of thrown into a corner," and whereas "[m]ost of the items in the garage were dusty and dirty and appeared to have been stored there for a while," the equipment at issue "seemed to be just recently put there." MDEA Agent MacMaster, the officer who photographed the equipment, testified that the items struck him as being suspicious because

> at that particular time there wasn't any evidence that I was aware of that Mr. Dignoti or Sharman Walsh were involved in the heavy duty construction business and would have equipment like that.
>
> And also the fact that you have commercial construction equipment and then you have an outboard motor and a chainsaw

amongst it, just didn't seem to group together well in my mind.

Although at the time of the search the officers lacked specific information as to whether the observed equipment was stolen, Grotton and MacMaster testified that previously they had been informed that Dignoti had been in receipt of stolen property. On the basis of these facts and circumstances, we conclude the trial court did not commit clear error by its determination that the officers had probable cause to believe the items in the garage were stolen property. Accordingly, applying the plain view doctrine to the present circumstances of this case, we conclude the movement of those items does not constitute an unreasonable search.

We find no merit in Dignoti's assertion that a warrant issued on January 18, 1995, for the search of his premises at Kenduskeag was without probable cause and that the wallet seized in execution of that warrant exceeded the scope of the warrant.

The entry is:

Judgments affirmed.

All concurring.