STATE OF MAINE                          UNIFIED CRIMINAL DOCKET

Cumberland, ss.

STATE OF MAINE

　　v.                                   Docket No. CUMCD-CR-17-03516

ERIC TORRES-CRUZ

　　　　　Defendant

## ORDER ON MOTION TO SUPPRESS

Defendant Eric Torres-Cruz is charged with Unlawful Possession of Suboxone, Class D. *See* 17-A M.R.S. § 1107(A)(1)(C). He has filed a Motion to Suppress, claiming that the Suboxone that is the basis for the charge was discovered by police in the course of an illegal stop and as the result of an illegal search and seizure. The court interprets the Motion as, not only seeking to suppress the Subxone itself, but also to suppress any and all evidence associated with what the Defendant contends was an illegal stop, search and seizure.

Hearing on Defendant's Motion to Suppress was held February 6, 2018. The witnesses were Officer Jason Leadbetter of the Portland Police Department and the Defendant. A video disk was marked and admitted by agreement as State's Exhibit 1. State's Exhibit 2 was marked but not admitted.

1

The parties stipulated that State's Exhibit 1 contains an audio and video recording, made by a police cruiser dash camera, of the encounter between police and Defendant that resulted in the charge. The parties also stipulated that the object marked as State's Exhibit 2 is the object seized by police from Defendant at the time of his arrest.

Based on the entire record, the court adopts the following findings of fact and conclusions of law, and denies Defendant's Motion to Suppress.

*Findings of Fact*

Defendant Eric Torres-Cruz, although a United States citizen, has a very limited command of English, his first language being Spanish. A Spanish-language interpreter provided translation at the suppression hearing.

Around 1:20 a.m. on June 15, 2017, Defendant was bicycling home in Portland from a friend's house, where he had spent about two hours after getting off work. At the friend's house, Defendant had consumed one or more alcoholic beverages and had smoked marijuana. Defendant took Ocean Avenue to get from his friend's home on Forest Avenue to his own home on Washington Avenue. After bicycling uphill, he got off his bicycle and continued walking on the sidewalk. He was headed eastward on Ocean Avenue where it abuts Payson Park, when a police cruiser headed west on Ocean Avenue pulled over and came to a stop near him.

Inside the cruiser were Officer Leadbetter and another Portland Police officer, Officer Jaynes. Both officers were in uniform and the cruiser was

2

marked with the insignia of the Portland Police Department. They were engaged in routine patrol, but were paying particular attention to the Payson Park area due to reports of motor vehicle burglaries in the area. However, they had no particular reason to suspect that the Defendant was involved in any of the burglaries or any other criminal activity. Still, in view of the fact that he was walking by himself at a very late hour, they decided to pull over and approach him to initiate a conversation.

The cruiser is equipped with a forward facing video camera, and the camera was recording before and during the officers' encounter with the Defendant. The cruiser's headlights were on, in view of the hour of night. None of the other lights on the cruiser—the blue lights or the spotlight—was activated before or during the initial part of the officers' encounter with the Defendant. Toward the latter part of the video, after the officers had discovered the Defendant to be in possession of Suboxone and had decided to place him under arrest, the cruiser video reflects intermittent flashing that the court infers to indicate that the blue lights had been activated.

The interaction between the officers and Defendant is not shown on the video, because the interaction was on the sidewalk on the right side of the cruiser rather within the forward-facing field of view of the video camera. The audio portion of the cruiser camera recording began when the officers exited the vehicle.

3

The officers came up to where the Defendant was standing on the sidewalk with his bicycle, and they stood about five feet from him. One or both of them may have been standing in the direction in which the Defendant had been walking. Officer Jaynes asked the Defendant if he would produce identification. The Defendant willingly complied with the request—he testified at trial that "I had no problem" with the request—and he removed his wallet from his back trouser pocket.

When the Defendant opened his wallet to retrieve the identification he was planning to show to the officers, the officers could see, in plain view from where they stood, an object with labeling printed on it sitting on or partly in the open wallet. The officers immediately recognized the object, based on the labeling, to be a package of Suboxone. *See* State's Ex. 2. Possession of Suboxone without a valid prescription is illegal in Maine.

As the officers asked the Defendant questions about the package, Officer Leadbetter took the package from out of the Defendant's open wallet and kept it. All of the foregoing occurred within two and a half minutes after the officers had exited the vehicle.

The officers confirmed that the package had a sublingual Suboxone strip inside, and asked Defendant where he had gotten the Suboxone and whether he had a prescription for it.

The audio makes clear that the Defendant did not understand their question about a prescription, because they asked the question several times

4

and did not get a response. When they asked instead where the Defendant had gotten the Suboxone, he understood, and replied he had gotten it from "a guy." The officers were not able to establish definitively whether the Defendant had a prescription for Suboxone, but neither at that time nor subsequently has he claimed to have a prescription.

After discovering and seizing the Suboxone, the officers asked Defendant a number of other questions—about where he worked, when he got off work, and whether he owned the bicycle. Defendant was able to answer these questions. He said, for example, that the bicycle belonged to a friend. When asked, "Where are you going now?" the Defendant said, "Home," and was able to give an address.

The officers also asked to search the Defendant's backpack. Defendant agreed to the request.

At the 9:30 mark on the video, the discussion took on a custodial nature. At no time prior to that point did the officers use physical force or make a show of authority for purposes of rendering their encounter with the Defendant non-consensual. However, at that point, Defendant was told he was being arrested. After further discussion, he was placed into the cruiser at about the 12:45 mark on the video.

5

*Analysis*

Defendant's Motion to Suppress challenges each phase of the encounter:

- The Motion asserts that the Defendant was unlawfully stopped or detained.

- The Motion asserts that the officers' discovery of the Suboxone package was the product of an unlawful search

- The Motion asserts that the seizure of the Suboxone package was unlawful.

The Motion challenges the officers' request for the Defendant to produce his identification. The Defendant also argues that he thought he was required to produce his identification, although he did acknowledge in his trial testimony that he was willing to do so.

The State contends that the officers were entitled to approach Defendant while he was walking his bicycle along the sidewalk and to ask him for identification. The State says it was Defendant who exposed the Suboxone package to plain view when he pulled out his wallet and opened it. The State contends that, because the Suboxone package was in plain view and because it was obviously illegal without a prescription, the officers were entitled to find out how the Defendant obtained the Suboxone packet, and to seize it.

6

For the following reasons, the court denies the Defendant's Motion to Suppress.

1. The Officers Were Entitled to Approach, Question the Defendant in the Manner that They Did, and Ask Him to Show Identification

The United States Supreme Court decision in *Florida v. Bostick* addresses the issues raised by the Defendant about the initial stage of his encounter with the officers and resolves its legality in favor of the State's position:

> Our cases make it clear that a seizure does not occur simply because a police officer approaches an individual and asks a few questions. So long as a reasonable person would feel free "to disregard the police and go about his business," the encounter is consensual and no reasonable suspicion is required. The encounter will not trigger Fourth Amendment scrutiny unless it loses its consensual nature. The Court made precisely this point in *Terry v. Ohio*, 392 U.S. 1, 19, n. 16, 20 L. Ed. 2d 889, 88 S. Ct. 1868 (1968): "Obviously, not all personal intercourse between policemen and citizens involves 'seizures' of persons. Only when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen may we conclude that a 'seizure' has occurred."

*Florida v. Bostick*, 501 U.S. 429, 434, 111 S. Ct. 2382, 115 L. Ed. 2d 389 (1991) (internal citations and quotations omitted).

Thus, even though the officers had no reason to believe—and therefore no reasonable articulable suspicion--that the Defendant was involved in motor vehicle burglaries or any other criminal activity, they were free to approach him and ask him at least a few questions. They also were entitled to ask to see his identification. *See INS v. Delgado*, 466 U.S. 210, 216, 80 L. Ed. 2d 247, 104 S. Ct. 1758 (1984).

7

The Defendant argues that the fact that one or perhaps both of the officers were standing in his way means he was detained. The defendant in *Bostick* was seated on a bus with two officers in the aisle, blocking his way out, "towering over him," and asking him questions, one officer carrying a pistol inside a zippered pouch. The Florida Supreme Court viewed the facts as so clearly constituting a seizure that it adopted a per se rule that the police could never question a person sitting on a bus, but the United States Supreme Court disagreed—the Court did not view these circumstances as necessarily constituting a "seizure" for purposes of the Fourth Amendment, and instead remanded the case for further findings. *Id.*, 501 U.S. at 434-37, 111 S. Ct. 2382, 115 L. Ed. 2d 389.

As the Court in *Bostick* said, "no seizure occurs when police ask questions of an individual, ask to examine the individual's identification, and request consent to search his or her luggage -- so long as the officers do not convey a message that compliance with their requests is required." *Id,* 501 U.S. at 437, 111 S. Ct. 2382, 115 L. Ed. 2d 389.

In this case, during the initial phase of their interaction with the Defendant, the officers used no physical force to stop or detain or restrain the Defendant, made no show of force, and never conveyed that compliance with their requests was required. It is true that they never told him he did not have to talk to them or answer their questions, but they were not required to do so.

8

The Defendant's limited understanding of English did not prevent him from understanding the officers' initial questions, including the request that he produce identification. He understood the request and pulled out his wallet promptly and willingly.

The Court in *Bostick* said it was adhering to "the rule that, in order to determine whether a particular encounter constitutes a seizure, a court must consider all the circumstances surrounding the encounter to determine whether the police conduct would have communicated to a reasonable person that the person was not free to decline the officers' requests or otherwise terminate the encounter." In this case, a reasonable person in Defendant's position during the initial portion of the encounter would have felt free to wish the officers a good night and continue on. The fact that the Defendant has only a limited understanding of English does not change that.

As noted above, only two and a half minutes had elapsed from the beginning of the officers' encounter with Defendant to the point where he brought out and opened his wallet, giving the officers a plain view of a Suboxone package. Only a few questions had been asked as of that point, but at that point, as discussed below, the character of the encounter changed.

Accordingly, the court concludes that the officers' actions in approaching the Defendant, standing near him and asking him a few initial

9

questions did not constitute a seizure, for purposes of either the Fourth Amendment or the Maine Constitution.[1]

2. When Defendant Opened His Wallet, The Officers Saw the Suboxone Package in Plain View and Had Probable Cause To Seize It Without a Warrant

The nature of the encounter changed less than three minutes into the conversation, when the Defendant pulled out his wallet and opened it in order to extract his identification. Sitting in or on the open wallet, in the plain view of both officers from where they stood, was what they immediately recognized to be a Suboxone package. At that point the officers had probable cause for a warrantless seizure of contraband.

The Law Court has outlined three conditions that must be met in order to validate a warrantless seizure of an item in plain view:

> First, the officer must not have violated the Fourth Amendment in arriving at the place in which the evidence is in plain view. Second, the incriminating character of the items to be seized must be immediately apparent. Third, the officer must have a lawful right of access to the items.
>
> *State v. Dignoti,* 682 A.2d 666, 671 (Me. 1996), *quoting State v. Kennedy,* 645 A.2d 7, 8 (Me. 1994).

Here, all three conditions are met. First, the officers were standing on a public sidewalk. Second, they immediately recognized the Suboxone package as one that cannot legally be possessed, without a valid prescription. Third,

---

[1] The Law Court has made it clear that "the Maine Constitution affords . . . no greater protection than that afforded under the Fourth Amendment of the United States Constitution." *State v. Ireland,* 1998 ME 35, ¶6, n.2, 706 A.2d 597, 599 n.2.

10

they could simply reach forward and take the item. The item was not inside a building, or in some other place that could not legally be accessed.

Defendant's Motion appears to take the position that the officers could not lawfully seize the Suboxone without first eliminating the possibility that Defendant might have a prescription for it, which they admittedly were not able to do. The cruiser video/audio does not show that the Defendant ever truly understood or responded to their questions about whether he had a prescription.

But the premise that a controlled substance can never be seized unless the officer has first determined that the possessor of it does not have a prescription is simply incorrect as a matter of law. Absence of a prescription is not an element of an illegal drug possession charge. Instead, the applicable statutes establish that having a prescription is an affirmative defense as to which a defendant bears the burden of persuasion. *See* 17-A § 1107-A(4); *see id.* § 101(2) (burden of persuasion on affirmative defenses).

Moreover, as a practical matter, the fact that a person might have a valid affirmative defense to a drug possession charge does not negate the validity of a seizure of drugs, provided there is probable cause to believe the drugs are illegal in the hands of the possessor. Otherwise, no drugs capable of being legally prescribed could be seized from anyone who claimed to have a prescription for them, until the officer had checked out the claim.

11

Thus, even had the Defendant claimed to have a prescription for Suboxone—a claim he did not make and still does not make—the officers would still have been entitled to seize the Suboxone packet. That point, in turn, means that the fact that the Defendant did not understand the officers' questions about having a prescription does not alter the validity of the seizure.

The Defendant was carrying a lone packet of Suboxone in his wallet and claimed to have gotten it "from a guy." These circumstances gave the officers ample probable cause for the seizure.[2]

*Conclusion*

Based on the entire record, the court finds and concludes that the seizure of the Suboxone package admitted at the suppression hearing as State's Exhibit 2 was lawful.[3] The court further finds and concludes that the officers' questioning of the Defendant prior to the point at which he was

---

[2]   The Law Court has quoted with approval a First Circuit definition: "Probable cause to support a plain view seizure requires more than hunch, guesswork, and cop-on-the-beat intuition, but less than proof beyond a reasonable doubt or a "near certainty" that the seized item is incriminating. There must be enough facts for a reasonable person to believe that the items in plain view may be contraband or evidence of a crime. A "practical, nontechnical" probability that incriminating evidence is involved is all that is required." *State v. Dignoti*, 682 A.2d 666, 672 (Me. 1996), *quoting United States v. Giannetta*, 909 F.2d 571, 579 (1st Cir. 1990) (internal quotations and citations omitted).

[3]   The Defendant's Motion to Suppress does not attempt to identify the point at which the encounter became custodial for purposes of suppressing his statements. Instead, the Motion asserts that the entire encounter was a seizure and should be suppressed. This Order does not adopt that view—Defendant was eventually seized for purposes of the Fourth Amendment, but not until after the officers had already taken the Suboxone package from his wallet. Were the court to reach the issue, Defendant's answers to any questions after 9:30 on the video would likely be suppressed unless Miranda warnings had been administered first.

12

placed under arrest was lawful and neither coerced nor custodial. Accordingly, Defendant's Motion to Suppress is hereby denied.

Dated 13 February 2018

_____
A. M. Horton, Justice