2007 ME 113

**STATE of Maine**

v.

**Charles B. RABON et al.**

Supreme Judicial Court of Maine.

Argued: May 10, 2006.
Decided: Aug. 14, 2007.

Majority: CALKINS, LEVY, and SILVER, JJ.

Concurrence: ALEXANDER, J.

Dissent: SAUFLEY, C.J. and CLIFFORD, J.

LEVY, J.

[¶ 1] Charles B. and Sharon R. Rabon appeal from judgments of conviction entered in the Superior Court (Oxford County, *Gorman, J.*) on Charles's conditional guilty plea for unlawful furnishing of a scheduled drug (Class C), 17–A M.R.S. § 1106(1–A)(A) (2006) and plea for criminal forfeiture, 15 M.R.S. § 5826 (2006), and on Sharon's conditional guilty plea for unlawful possession of a scheduled drug (Class D), 17–A M.R.S. § 1107–A(1)(C) (2006). The Rabons contend that the court (*Humphrey, C.J.*) erred when it denied their joint motion to suppress based on its conclusion that an initial warrantless entry into the Rabons' apartment by officers of the Rumford Police Department was unlawful, but that suppression of the evidence was not required based on the inevitable discovery exception to the exclusionary rule. We conclude that because probable cause to search did not exist without the information obtained during the initial warrantless entry, no exception to the warrant requirement or the exclusionary rule applies, and we vacate the convictions.

## I. BACKGROUND

[¶ 2] During the summer of 2004, the Rumford Police Department received information indicating that the Rabons were involved in transporting cocaine from Florida for sale in Maine. The Rumford police, in cooperation with the Maine Drug Enforcement Agency (MDEA), investigat-

G. Steven Rowe, Attorney General, Donald W. Macomber, Asst. Atty. Gen. (orally), David W. Fisher, Asst. Atty. Gen., Augusta, for State.

James F. Martemucci, Esq. (orally), Martemucci & Topchik, LLC, Portland, Leonard I. Sharon, Esq. (orally), Sharon, Leary & DeTroy, Auburn, for defendants.

Panel: SAUFLEY, C.J., and CLIFFORD, ALEXANDER, CALKINS, LEVY, and SILVER, JJ.*

* Justice Howard H. Dana Jr. sat at oral argument and participated in the initial conference but retired before this opinion was certified.

ed the Rabons, and on August 13, 2004, sought and obtained a warrant to search the Rabons' apartment for evidence of drug trafficking.

## A. Events Preceding the Issuance of the Search Warrant

[¶ 3] The information concerning the Rabons' activities came from a confidential informant who was the subject of a pending criminal charge or charges. The informant requested prosecutorial consideration if any of the information he or she provided proved helpful in a drug trafficking case. The confidential informant claimed that Charles Rabon drives to Florida several times during the year to pick up large amounts of cocaine, brings the cocaine back to the apartment that he shares with his wife Sharon in Rumford, and then distributes most of his cocaine to local dealers for sale at local bars where Charles operates a karaoke business.

[¶ 4] As found by the Superior Court, on August 13, five police officers were sent to the Rabons' apartment to secure the scene in anticipation of the issuance of a search warrant that was to be sought by other officers. The officers arrived at the Rabons' apartment at 11:58 A.M. An officer in plain clothes, but wearing a vest that clearly identified him as a police officer, knocked on the closed front door of the apartment. One of the other officers observed a woman peek through the blinds of a window near the door. One of the officers heard the woman say "Oh shit," and observed her run toward the back of the apartment. The officers immediately opened the door and entered the apartment without consent and located both Rabons. Charles was found sitting at a desk on which there was a container of white powder and a digital scale. The officers handcuffed the Rabons, conducted a brief

safety search of the house for firearms or other inhabitants, took photographs of the inside of the apartment, and made a list of the telephone numbers listed in the Rabons' telephone's caller ID. The officers then sat with the Rabons to await the issuance of a search warrant.

[¶ 5] The MDEA agent who participated in the preparation of the warrant request included in paragraphs ten and eleven of his affidavit information concerning the other officers' warrantless entry into the Rabons' apartment. The District Court (Rumford, *Lawrence, J.*) issued a search warrant at 4:31 P.M. The resulting search of the apartment led to the seizure of cocaine and money.

## B. The Warrant Affidavit

[¶ 6] The first paragraph of the warrant affidavit details the agent's training and experience in law enforcement and drug investigations.[1] The second paragraph explains that the agent was seeking the warrant at the request of the Rumford Police Department to search the Rabons' apartment and van "both situated at 73 Plymouth Avenue in Rumford (Oxford County), Maine[,] ... for cocaine and other evidence as it pertains to possession, furnishing and/or trafficking of scheduled drugs." The remaining paragraphs detail the initial information provided by the informant in June of 2004, and on August 11 and 13, 2004, and explain the extent to which the police were able to corroborate the same.

[¶ 7] The affidavit reports that the police corroborated that the Rabons' blue van was not at their apartment on August 11 and 12, and that it returned on August 13, a period corresponding to the informant's claim that the Rabons' were returning from a drug run to Florida. In addition, the affidavit reports police corroboration of

---

**1.** The MDEA agent's affidavit is attached as    Appendix A to this opinion.

the Rabons' names, telephone number, address, car, color of their apartment building, the fact that Charles Rabon had received a summons for excessive noise and had not been subject to a search, and that two bars in the Rumford and Mexico area, named by the informant as locations where Charles Rabon trafficked in drugs, were known to the police as places where drugs are trafficked. As already noted, it also contains a description of the entry into the Rabons' apartment by the police earlier that day.

## C. The Motion to Suppress

[¶ 8] Following their arrest, the Rabons were each charged with aggravated trafficking of scheduled drugs (Class A) pursuant to 17–A M.R.S. § 1105–A(1)(C–1)(1) (2006), and a count seeking criminal forfeiture pursuant to 15 M.R.S. § 5826. The Rabons filed a joint motion to suppress all of the evidence obtained from their apartment. They contended that the police had, without probable cause, conducted a warrantless search when they initially entered the apartment and had then used the information illegally obtained through the search to establish probable cause in a warrant affidavit. The Rabons contended that the resulting search warrant was based upon wrongfully obtained information and was, therefore, unlawful, in violation of the United States and Maine Constitutions.

[¶ 9] The Superior Court denied the motion to suppress. The court found that the initial warrantless entry into the Rabons' apartment was illegal and not justified by the exigent circumstances exception to the warrant requirement. The court reasoned that the police had created the exigency by knocking on the apartment's door. Nonetheless, the court concluded that suppression of the evidence obtained as a result of the initial and post-warrant searches of the Rabons' apartment was not required. The court applied the inevitable discovery exception to the exclusionary rule, and concluded that "the warrant was truly independent from the [initial] illegal entry[,] and discovery of the physical evidence by that lawful means was truly inevitable."

[¶ 10] After the denial of the joint motion to suppress, Sharon Rabon entered a conditional guilty plea to unlawful possession of a scheduled drug (Class D), 17–A M.R.S. § 1107–A(1)(C), and, pursuant to a plea agreement, the aggravated trafficking and criminal forfeiture counts of the indictment were dismissed by the State. Charles Rabon entered a conditional guilty plea to unlawful furnishing of a scheduled drug (Class C), 17–A M.R.S. § 1106(1–A)(A), and as a result of this and his plea to criminal forfeiture, the State dismissed the aggravated trafficking count. The Superior Court approved the Rabons' conditional guilty pleas, thereby preserving their right to appeal from the court's denial of their motion to suppress.[2] This appeal followed.

## II. DISCUSSION

[¶ 11] "It is beyond question that a person's home, and the rights of an individual within that home, have a special place in our jurisprudence." *State v. Boilard*, 488 A.2d 1380, 1388 (Me.1985). The United States and Maine Constitutions guarantee the right to be secure in one's home from unreasonable searches and sei-

2. Charles Rabon was sentenced to imprisonment for two-and-one-half years, with all but 120 days suspended, and two years of probation, including one hundred hours of public service. Sharon Rabon was sentenced to imprisonment for 364 days, all suspended, and one year of probation.

zures.[3] A warrantless search of a home is, as a matter of law, unreasonable unless: (1) "it is supported by probable cause" and "exigent circumstances exist requiring a prompt search, without the delay occasioned by the need for a warrant"; or (2) "the search is pursuant to another recognized exception to the warrant requirement." *State v. Leonard*, 2002 ME 125, ¶ 12, 802 A.2d 991, 994 (quotation marks omitted).

[¶ 12] The Rabons' central contention is that because the officers lacked probable cause to search the apartment prior to the warrantless entry, no evidence gathered from the initial warrantless entry into the apartment or from the subsequent search of the apartment pursuant to the warrant can be admitted against them. The State contends that the contested evidence was lawfully seized because the officers' initial warrantless entry into the apartment was justified by the exigent circumstances exception to the warrant requirement;[4] was nonetheless justified as a reasonable, temporary seizure in order to secure the premises and preserve any evidence within it pending the issuance of a search warrant; or because, as the Superior Court concluded, the inevitable discovery exception permits the admission of the evidence seized from the Rabons.

■ [¶ 13] The parties' contentions cause us to consider: (A) the exigent circumstances exception to the warrant requirement; (B) a temporary seizure of the premises to secure the scene pending the issuance of a warrant as an exception to the warrant requirement; (C) the independent source exception to the exclusionary rule;[5] and (D) the inevitable discovery exception to the exclusionary rule. As will be further explained, for any of these exceptions to apply, the officers must have had probable cause to search the Rabons' apartment at the time that they made their initial warrantless entry into the apartment. We begin by identifying and explaining these exceptions and how each is dependent on probable cause in this case. We conclude by addressing whether, under the totality of the circumstances, there was probable cause to search the Rabons' apartment prior to the officers' warrantless entry into the apartment.

**3.** The United States Constitution provides, "The right of the people to be secure in their persons, houses, papers and effects against unreasonable searches and seizures, shall not be violated." U.S. CONST. amend. IV. The Maine Constitution provides, "The people shall be secure in their persons, houses, papers and possessions from all unreasonable searches and seizures." ME. CONST. art. I, § 5.

**4.** Although the State did not file a notice of appeal, it has the right to challenge the Superior Court's determination regarding the issue of exigent circumstances on appeal pursuant to 15 M.R.S. § 2115–A(3) (2006).

**5.** Although the Rabons and the State disagree as to whether the court properly applied the inevitable discovery exception, they do not challenge the court's use of the inevitable discovery exception as the analytical framework for its conclusion that neither the evidence seized by the police following their initial warrantless entry, nor the evidence seized following the issuance of the search warrant, should be suppressed. For reasons to be more fully addressed, we conclude that the evidence seized following the issuance of the search warrant is more properly analyzed under what is known as the independent source exception. Although the inevitable discovery and independent source exceptions are similar, they are not identical. An independent source exception analysis is appropriate in circumstances where a search warrant was issued, but some of the information used to establish probable cause is determined to have been illegally obtained. *See State v. Storer*, 583 A.2d 1016, 1019 (Me. 1990).

## A. Exigent Circumstances

■ [¶ 14] The exigent circumstances justification for warrantless searches applies when "there is a compelling need to conduct a search and insufficient time in which to secure a warrant." *State v. Dube*, 655 A.2d 338, 340 (Me.1995). However, probable cause is a prerequisite for the exigent circumstances justification to apply. *See Leonard*, 2002 ME 125, ¶ 12, 802 A.2d at 994. Accordingly, the exigent circumstances exception to the warrant requirement authorizes the warrantless entry in this case only if the officers had probable cause to search the Rabons' apartment at the time they made the decision to enter the Rabons' apartment.

## B. Temporary Seizure of the Premises to Secure the Scene

■ [¶ 15] The temporary seizure of a residence for the purpose of preserving evidence pending the issuance of a warrant is another recognized exception to the warrant requirement. Such a seizure is constitutionally sound under certain circumstances, but only if the officers have probable cause to search at the time they entered the residence. *See Illinois v. McArthur*, 531 U.S. 326, 331, 121 S.Ct. 946, 148 L.Ed.2d 838 (2001); *Segura v. United States*, 468 U.S. 796, 798, 104 S.Ct. 3380, 82 L.Ed.2d 599 (1984). As applied here, if the officers did not have probable cause to search the premises at the time they entered the residence, then this exception is inapplicable and cannot support the denial of the motion to suppress.

## C. The Independent Source Exception

■ [¶ 16] The independent source exception to the exclusionary rule permits the use of evidence that has been obtained in violation of the Fourth Amendment to the United States Constitution and article I, section 5 of the Maine Constitution when that evidence "was gained through an independent source as well as the tainted source." *State v. Storer*, 583 A.2d 1016, 1019 (Me.1990) (quoting *United States v. Silvestri*, 787 F.2d 736, 740 (1st Cir.1986)). An independent source exception analysis is appropriate in circumstances where a search warrant was issued, but some of the information used to establish probable cause is determined to have been illegally obtained. *See Storer*, 583 A.2d at 1019. If the magistrate would still have had probable cause to issue the warrant without the allegedly unlawfully obtained information, the independent source exception allows the admission of the evidence, and suppression is not justified. *Id.*

■ [¶ 17] In the present case, most of the evidence sought to be suppressed was discovered during the search of the Rabons' apartment following the issuance of a search warrant. If we conclude that the warrantless entry of the apartment was neither justified under the exigent circumstances exception to the warrant requirement nor as a temporary seizure of the premises, an independent source exception analysis is justified. To determine whether the independent source exception will permit admission of the evidence obtained pursuant to the warrant in this case, we: (1) "excise[ ] from the affidavit used to obtain the warrant all the information ... believed [to have] been illegally obtained," and then (2) determine whether the judge or magistrate "would have had probable cause to issue the warrant relying solely on the remaining information." *Id.*

■ [¶ 18] As to the first step, the information in paragraphs ten and eleven of the affidavit detailing the initial warrantless entry and consequent observations of the police must be excised from the affidavit. Turning to the second step, we review the redacted affidavit without paragraphs ten and eleven to see if a

magistrate nonetheless could have found probable cause to issue the warrant. Because there is no magistrate determination regarding the warrant affidavit with paragraphs ten and eleven excised, we review de novo whether the evidence in the redacted affidavit, read positively, is sufficient to establish probable cause. *See United States v. Barajas–Avalos,* 377 F.3d 1040, 1058 (9th Cir.2004) ("We review de novo the question whether probable cause exists after allegedly tainted information has been redacted from an affidavit."). If the redacted affidavit does not support probable cause to search the apartment, then the independent source exception will not permit the admission of the contested evidence.

### D. The Inevitable Discovery Exception

■ [¶ 19] The inevitable discovery exception is an additional analytical framework for considering the suppression of the evidence if we conclude that the initial warrantless entry into the Rabons' apartment prior to the issuance of the search warrant was unlawful because there was no probable cause. The inevitable discovery exception to the exclusionary rule permits the use of evidence that has been obtained in violation of the Fourth Amendment to the United States Constitution and article I, section 5 of the Maine Constitution when that evidence "inevitably would have been discovered by lawful means." *Storer,* 583 A.2d at 1020 (quoting *Nix v. Williams,* 467 U.S. 431, 444, 104 S.Ct. 2501, 81 L.Ed.2d 377 (1984)). The specific question presented here is whether the evidence discovered by the police when they initially entered the Rabons' apartment with the intent of securing it would have been inevitably discovered through lawful means.

■ [¶ 20] If a warrant would not have issued without the information resulting from the initial warrantless entry reported in paragraphs ten and eleven of the affidavit, there would not be a lawful means to enter the apartment, and it would not be inevitable that the police would have lawfully discovered the evidence they discovered during their initial warrantless entry. *See Storer,* 583 A.2d at 1020. Accordingly, for the inevitable discovery exception to apply in this case, it requires that the police had probable cause at the time they entered the Rabons' apartment.

### E. Probable Cause

[¶ 21] All of the above exceptions to the warrant requirement and the exclusionary rule require the existence of probable cause at the time of the initial warrantless entry into the Rabons' apartment. The parties do not contend that the probable cause analysis differs depending on whether we focus on the existence of probable cause to search at the time the police made their warrantless entry, or on whether the redacted warrant affidavit shows probable cause.

#### 1. The Probable Cause Standard

■ [¶ 22] To determine probable cause, a magistrate must apply the "totality-of-the-circumstances approach" articulated in *Illinois v. Gates,* 462 U.S. 213, 230, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983). Probable cause is established when, "given all the circumstances set forth in the affidavit before [the magistrate], including the veracity and basis of knowledge of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place." *State v. Wright,* 2006 ME 13, ¶ 8, 890 A.2d 703, 705 (quotation marks omitted). "Courts must give the affidavit a positive reading and review the affidavit with all reasonable inferences that may be drawn to support the magistrate's determi-

nation." *State v. Higgins,* 2002 ME 77, ¶ 20, 796 A.2d 50, 56 (quotation marks and alteration omitted).

■■■■ [¶ 23] When a warrant affidavit reports information provided by an informant, the veracity and basis of knowledge of the informant are considerations that:

should [not] be understood as entirely separate and independent requirements to be rigidly exacted in every case.... Rather, ... they should be understood simply as closely intertwined issues that may usefully illuminate the common-sense, practical question whether there is "probable cause" to believe that contraband or evidence is located in a particular place.

*State v. Knowlton,* 489 A.2d 529, 531 (Me. 1985) (quoting *Gates,* 462 U.S. at 230, 103 S.Ct. 2317). *Gates* emphasized that the totality-of-the-circumstances approach "permits a balanced assessment of the relative weights of all the various indicia of reliability (and unreliability) attending an informant's tip." 462 U.S. at 234, 103 S.Ct. 2317. Probable cause may be established despite an affidavit's deficiency in discrete areas.

[¶ 24] In *Gates,* the Court considered an affidavit that contained information derived from a letter written by an anonymous informant. *Id.* at 225, 103 S.Ct. 2317. The police had no information concerning the informant's reliability or basis of knowledge. *Id.* at 227, 103 S.Ct. 2317. Because of the absence of direct information about the informant's reliability or basis of knowledge, the Court stated that "something more" than the information provided by the informant was needed "before a magistrate could conclude that there was probable cause." *Id.* That "something more" was established by police corroboration of the informant's tip as reported in the affidavit. *Id.* at 244, 103 S.Ct. 2317. The police investigation corroborated the

informant's prediction that the suspect had traveled to Florida to purchase drugs by tracking the suspect's trip to Florida and quick return to Illinois. *Id.* at 244–45, 103 S.Ct. 2317. The Court stated that: "It is enough, for purposes of assessing probable cause, that corroboration through other sources of information reduced the chances of a reckless or prevaricating tale, thus providing a substantial basis for crediting the hearsay." *Id.* (quotation marks and alteration omitted).

2. The Probable Cause Standard Applied to the Warrant Affidavit for the Search of the Rabons' Apartment

■■■ [¶ 25] The warrant affidavit signed by the MDEA agent is based largely on information provided to him by the confidential informant. In viewing the affidavit, as redacted, in its most positive light, we assess the information in the affidavit regarding the informant's: (a) reliability and basis of knowledge; (b) claims regarding the Rabons' criminal activities; and (c) reports of other information concerning the Rabons. We conclude the analysis by applying the totality of the circumstances test.

a. Informant's Reliability and Basis of Knowledge

[¶ 26] The warrant affidavit reveals very little about the informant's background. It reports that the confidential informant contacted the police wishing to share information about drug trafficking occurring in Rumford in order to receive "prosecutorial consideration if any information provided is helpful in a drug trafficking case." The informant is described as not being on probation, but as being on bail for non-drug related offenses; as not receiving any remuneration in exchange for information; and as having provided additional informa-

tion on other drug trafficking in the area. The affidavit does not provide any details regarding this additional information, or whether it had been found to be accurate.

[¶ 27] The affidavit fails to explain the basis for the informant's knowledge that the Rabons were engaged in drug trafficking. *See State v. Crowley*, 1998 ME 187, ¶¶ 6–7, 714 A.2d 834, 837. The affidavit does not assert that the informant had actually seen firsthand any contraband or criminal activity. The affidavit also does not contain any statement to the effect that the informant has been found or is otherwise believed by the MDEA agent or other law enforcement officials to be a reliable reporter of information. *See id.* ¶ 6, 714 A.2d at 837.

■ [¶ 28] The informant is not a disinterested "citizen informant," but is instead a "confidential informant" who "disclose[d] information to the authorities in hopes of lessening his or her own exposure to criminal sanctions." *State v. Perrigo*, 640 A.2d 1074, 1076 (Me.1994). "Courts are much more concerned with veracity when the source of the information is an informant from the criminal milieu rather than an average citizen who has found himself in the position of a crime victim or witness." 2 WAYNE R. LAFAVE, SEARCH AND SEIZURE § 3.4 at 219 (4th ed.2004). In addition, the affidavit does not report that the informant provided any information against the informant's own penal interests, which is another basis on which to infer the reliability of information provided by an informant. *See State v. Dignoti*, 682 A.2d 666, 670 (Me.1996).

■ [¶ 29] In short, the affidavit offers no information of the type commonly presented in search warrant affidavits that would allow a magistrate to form an opinion regarding an anonymous or confidential informant's reliability or basis of knowledge. In all but a few of the warrant affidavits involving confidential or anonymous informants we have considered since *Gates*, the affidavits included at least a modicum of information that addressed the informant's reliability or basis of knowledge.[6] An affidavit that supplies no information about an informant's reliability or basis of knowledge fails to provide information that is "highly relevant" to the probable cause determination. *See Crowley*, 1998 ME 187, ¶ 6, 714 A.2d at 837.

6. *See State v. Crowley*, 1998 ME 187, ¶¶ 2, 8, 714 A.2d 834, 836–37 (named informant with potentially stale first-hand information and conclusory statements by reliable informants); *State v. Dignoti*, 682 A.2d 666, 668, 670 (Me. 1996) (multiple informants, including citizen informants and one who made statement against penal interest); *State v. Allard*, 674 A.2d 921, 922 (Me.1996) (monitored purchases by confidential informant and information from concerned citizen informants); *State v. Ward*, 624 A.2d 485, 487 (Me.1993) (first informant, reliable in past, with report of personal observation of drug activity; second informant with report of first-hand information and attempt at monitored drug purchase); *State v. Veglia*, 620 A.2d 276, 277 (Me.1993) (two confidential informants, both reliable in past, and one involved in controlled purchases); *State v. Van Sickle*, 580 A.2d 691, 693–94 (Me.1990) (informant participation in controlled purchases of illegal drugs); *State v. Nickerson*, 574 A.2d 1355, 1356 (Me.1990) (informant report of personal observation of marijuana plants); *State v. Haley*, 571 A.2d 831, 833 (Me.1990) (informant participation in controlled purchases of illegal drugs); *State v. Gallant*, 531 A.2d 1282, 1284 (Me.1987) (informant actions against penal interest); *State v. Currier*, 521 A.2d 295, 297 (Me.1987) (informant reliable in past and informant signal of drug delivery suggesting personal observation); *State v. Salley*, 514 A.2d 465, 466 (Me.1986) (informant participation in three controlled purchases of illegal drugs); *State v. Knowlton*, 489 A.2d 529, 530–31 (Me.1985) (informant statements against penal interest, statements by another police department that informant was reliable, informant's personal observation of drug activity, and informant participation in controlled purchase of cocaine).

The absence of such information does not preclude a finding of probable cause, but, as established in *Gates*, absent that information, "something more" is required. 462 U.S. at 227, 103 S.Ct. 2317.

### b. Corroboration of Informant's Claims of Suspicious or Criminal Activity

[¶ 30] Our decisions establish that "something more" is frequently supplied by police corroboration of the informant's reports regarding suspicious or criminal activities by the person suspected of wrongdoing. *See, e.g., State v. Thibodeau,* 2000 ME 52, ¶¶ 3, 7, 747 A.2d 596, 598–99 (corroborating informant tip without information about veracity or basis of knowledge by analysis of utility records, and infra-red observation of apartment); *State v. Lutz,* 553 A.2d 657, 658–59 (Me.1989) (corroborating informant tip by observation of four marijuana gardens with path leading to seasonal camp and partially corroborating information from named informant that defendant resided at seasonal camp); *State v. Nason,* 498 A.2d 252, 253 (Me.1985) (corroborating informant tip through police observation of suspicious activity at residence for eleven-day period). Indeed, in every search warrant affidavit we have addressed since *Gates,* the affidavit included information depicting contextually suspicious or overtly criminal activity by a suspect who was observed by someone in addition to or other than an anonymous or confidential informant.[7]

---

7. Such direct observations are most frequently made by law enforcement officers. *See State v. Dickinson,* 2005 ME 100, ¶¶ 2–3, 881 A.2d 651, 653–54 (observations of suspicious behavior at place to be searched over several month period); *State v. Coffin,* 2003 ME 83, ¶ 5, 828 A.2d 208, 209 (observation of marijuana plants with path from plants to defendant's home); *Crowley,* 1998 ME 187, ¶¶ 2, 8, 714 A.2d at 836–37 (observation of furtive behavior of defendant's wife at defendant's home in addition to information from named informant and two confidential informants); *Dignoti,* 682 A.2d at 668, 670 (observation of predicted multiple home visits in short time period by alleged associate of defendant and controlled purchase implicating defendant); *Allard,* 674 A.2d at 922 (observation of numerous brief suspicious visits to premises and two monitored sales from premises); *Ward,* 624 A.2d at 487 (monitored conversation); *Veglia,* 620 A.2d at 277 (informant prediction of defendant's arrival at particular apartment and subsequent observation of known cocaine users entering and exiting the apartment after short period of time); *Storer,* 583 A.2d at 1017–18 (Me.1990) (police observation of defendant placing bag of marijuana in woods); *Van Sickle,* 580 A.2d at 693–94 (controlled purchases of illegal drugs); *State v. Edwards,* 575 A.2d 321, 322–23 (Me.1990) (observation of marijuana plants and path leading directly from plants to defendant's residence); *State v. Townsend,* 571 A.2d 1206, 1207 (Me.1990) (detection of marijuana odor from driveway of house); *Haley,* 571 A.2d at 833 (two controlled purchases of illegal drugs); *State v. Wing,* 559 A.2d 783, 784–85 (Me.1989) (airplane flyover observation of marijuana plants on defendant's property and observation in woods of marijuana plants on defendant's property); *Gallant,* 531 A.2d at 1284 (controlled purchase and suspicious statement by defendant's dealer); *Currier,* 521 A.2d at 297 (discovery of marijuana on defendant after pat-down and partial corroboration of predicted drug delivery); *Salley,* 514 A.2d at 466 (three controlled purchases of illegal drugs); *State v. Friel,* 508 A.2d 123, 125, 127 (Me. 1986) (observation of gun in plain view in defendant's home pursuant to another search warrant); *Knowlton,* 489 A.2d at 530–31 (controlled purchase). *See also State v. Diamond,* 628 A.2d 1032, 1033–34 (Me.1993) (probable cause not established by police observations of activities consistent with the possibility of criminal activity without an outside allegation of criminal activity).

Direct observations have also stemmed from police investigation and analysis of evidence. *See State v. Higgins,* 2002 ME 77, ¶¶ 21–22, 796 A.2d 50, 57 (officer's investigation of murder scene, including DNA test results matching defendant); *Nickerson,* 574 A.2d at 1356 (receipt of corroborating photograph); *State v. Morse,* 563 A.2d 1107, 1108 (Me.1989) (match of logs impaled in victim's truck with logs of defendant's truck); *State v. Barczak,* 562 A.2d 140, 143 (Me.1989) (match

[¶ 31] An affidavit's inclusion of information regarding the observations of a person in addition to an informant is by no means required to establish probable cause under the totality of the circumstances test. As demonstrated in our decisions, however, it is a form of corroboration that is frequently included in warrant affidavits.

[¶ 32] The affidavit in this case reveals that the police corroborated, to a limited degree, the informant's report that Charles and Sharon Rabon had recently left Florida and were en route back to Rumford in their van in possession of cocaine. Specifically, the police observed that the Rabons' van was not parked at their apartment on August 11 and 12, and that the van returned on August 13. This partial corroboration of the informant's information, considered positively, is somewhat supportive of probable cause because it lends support to the reliability of the informant.[8] The absence of the Rabons' van on August 11 and 12, and its return on August 13 was not, however, contextually suspicious.

c. Corroboration of Other Information Concerning the Rabons

[¶ 33] The MDEA agent's affidavit also corroborates other information provided by the informant, such as the Rabons' names, telephone number, address, car, the color of their apartment building, and the fact that Charles Rabon had received a summons for excessive noise and had not been subject to a search. The corroboration of this readily available information reveals that the informant, or the persons

---

of defendant's gun to gun used in murder, defendant's statements about killings before information released to general public, and defendant's match of eyewitness description of suspected murderer).

When the police themselves have not observed criminal or suspicious activity, observations establishing probable cause for a warrant have come from non-confidential or non-anonymous informants. *See State v. Samson*, 2007 ME 33, ¶ 17, 916 A.2d 977, 982 (victims); *State v. Wright*, 2006 ME 13, ¶ 3, 890 A.2d 703, 704 (citizen informant); *State v. Basu*, 2005 ME 74, ¶¶ 6–12, 875 A.2d 686, 689–90 (victim's coworker, defendant's friend to whom he confessed, janitor at defendant's place of employment, neighbors who heard gunshots, as well as DNA test results); *State v. Wilcox*, 2004 ME 7, ¶¶ 2–4, 840 A.2d 711, 712–13 (victim); *State v. Elwell*, 2002 ME 60, ¶ 17, 793 A.2d 499, 504 (victim); *State v. Lehman*, 1999 ME 124, ¶ 2, 736 A.2d 256, 258 (victims); *State v. Perrigo*, 640 A.2d 1074, 1076 (Me.1994) (citizen informant); *State v. Lamson*, 640 A.2d 1076, 1081 (Me.1994) (Department of Human Services investigator, various coworkers of defendant, victim, and victim's attorney, as well as review of defendant's bank records); *State v. Hamel*, 634 A.2d 1272, 1273 (Me.1993) (named cooperating defendant); *State v. Candage*, 549 A.2d 355, 356–57 (Me.1988) (defendant's former girlfriend, defendant's father, and information from citizen informant); *State v. Marquis*, 525 A.2d 1041, 1043 (Me.1987) (statement against penal interest by named coworker).

8. It is, however, substantially less than the degree of corroboration considered in *Gates*, where the police corroborated the informant's claim that the suspect had gone to Florida to purchase drugs by actually tracking the suspect's trip to Florida and return to Illinois. 462 U.S. at 243, 103 S.Ct. 2317. The degree to which predictive information was corroborated in this case is more akin to the circumstances considered by the Supreme Court in *Alabama v. White*, where the police corroborated a tip by observing the suspect traveling in a car in a manner that corresponded to the route to a motel as had been predicted by the informant. 496 U.S. 325, 332, 110 S.Ct. 2412, 110 L.Ed.2d 301 (1990). *White*, which was described by the Court as a "close case," applied the "reasonable suspicion" standard to support a *Terry* stop, a standard that is less demanding than the probable cause standard at issue here. *See id.* at 330, 332, 110 S.Ct. 2412; *see also* 2 WAYNE R. LAFAVE, SEARCH AND SEIZURE § 3.3(f) at 201–02 & n. 399 (4th ed.2004) (citing cases with facts resembling *White* that were held to be insufficient for probable cause for arrest or search).

providing information to the informant, were familiar with the Rabons. *See* 2 WAYNE R. LAFAVE, SEARCH AND SEIZURE § 3.3(f) at 179–80 (4th ed.2004). The informant's identification of two bars in the area known to the police as sites where drugs are trafficked establishes that either the informant, or the persons providing information to the informant, were generally familiar with drug activity in the area. The affidavit contains no corroboration of the informant's claim that Charles Rabon has a karaoke business, nor does it contain information that corroborates whether Charles Rabon was ever present at the two bars where the informant alleges the drugs were sold.

[¶ 34] None of the preceding information qualifies as "inside information" that would be uniquely available to an informant with direct knowledge of otherwise uncorroborated criminal activity. *See State v. Lafond*, 2002 ME 124, ¶¶ 9–10, 802 A.2d 425, 428–29. An informant's accurate description of readily available information establishes reliability in the "limited sense [that it] will help the police correctly identify the person whom the tipster means to accuse," but it "does not show that the tipster has knowledge of concealed criminal activity." *Florida v. J.L.*, 529 U.S. 266, 272, 120 S.Ct. 1375, 146 L.Ed.2d 254 (2000). Here, the informant's accurate description of readily available information

concerning the Rabons establishes that the informant, or the persons supplying information to the informant, were familiar with the Rabons and with drug trafficking in the vicinity.

d. Totality of the Circumstances Analysis

[¶ 35] When the police saw the Rabons' van return on August 13, they were in the middle of a promising investigation. Considered in its totality, however, the warrant affidavit, as redacted, does not contain information that establishes the informant's reliability or basis of knowledge, or corroborate in any significant way the informant's claim that the Rabons purchased cocaine in Florida for resale in Maine. The partial corroboration associated with the police observation of the van's absence from, and return to, the Rabons' apartment is not "a strong showing as to ... some other indicia of reliability" as contemplated by *Gates* that would justify a magistrate in crediting the otherwise unsupported claims of criminal activity by the Rabons made by an informant for whom the warrant affidavit provides no information concerning the informant's reliability or basis of knowledge. *See Gates*, 462 U.S. at 233, 103 S.Ct. 2317. Before the police could enter the Rabons' apartment, "something more" was required.[9] "[G]iven all the circumstances set forth in the affidavit

---

9. Contrary to the dissenting opinion, our decision does not stand for the proposition "that probable cause for a search cannot be based on information provided solely through a confidential informant without 'something more.'" *See infra* ¶ 57. Rather, we conclude under the circumstances presented in this case that probable cause could not be based on a confidential informant about whom little was known concerning the informant's reliability or basis of knowledge, without something more. This is, in fact, what *Gates* held. In addition, the comparison of this case to *Massachusetts v. Upton*, 466 U.S. 727, 104 S.Ct. 2085, 80 L.Ed.2d 721 (1984), is striking. In *Upton*, the warrant affidavit presented information concerning a named informant who was already known by the police to be the defendant's girlfriend, as she claimed, and the informant's first-hand observation of stolen property in the possession of the defendant. *Id.* at 729, 104 S.Ct. 2085. Thus, the warrant affidavit provided facts from which the magistrate could conclude that the informant had a basis to know what she claimed to know about the defendant's criminal activity. *Id.* at 733–34, 104 S.Ct. 2085.

... including the veracity and basis of knowledge of persons supplying hearsay information," the affidavit does not establish that there is a fair probability that contraband or evidence of a crime would be found in the Rabons' apartment. *See* *Wright,* 2006 ME 13, ¶ 8, 890 A.2d at 705 (quotation marks omitted).

[¶ 36] Because probable cause did not exist to search the apartment without the information gained from the warrantless entry into the apartment, none of the above discussed exceptions to the warrant requirement or the exclusionary rule apply, and the evidence seized from the Rabons' apartment during the initial warrantless entry and the subsequent search pursuant to the warrant should have been ordered suppressed.

The entry is:

Judgments of conviction vacated and remanded for further proceedings consistent with this opinion.

### Appendix A

### Affidavit of MDEA agent Tony L. Milligan in search warrant of Rabon apartment and vehicle.

### STATEMENT OF SPECIAL AGENT TONY L. MILLIGAN

1. I am presently employed as a Special Agent of the State of Maine Department of Public Safety Drug Enforcement Agency (MDEA) and have been since December 1992. I am the Assistant Supervisor assigned to the Lewiston Task Force Office. Previous to my current assignment, I was a sworn law enforcement officer for the Rumford, Maine Police Department for approximately 5 years where I was assigned to road patrol duties and drug enforcement investigations in conjunction with the Oxford County Drug Task Force. I am a 1989 graduate of the Maine Criminal Justice Academy (MCJA)

Municipal Police School and a 1993 graduate of the United States Department of Justice Drug Enforcement Administration (DEA) Narcotic Law Enforcement School. I am a certified Instructor for the U.S. Department of Treasury Federal Law Enforcement Training Center trained and authorized to teach drug law enforcement throughout the United States. This certification is recognized both on the Federal level and by the Maine Criminal Justice Academy. I have attended and completed various schools, seminars, and programs related to the investigation and prosecution of drug related criminal offenses, including specialized drug · enforcement/investigation schools, State and Federal law update schools, drug identification schools, and search and seizure schools. I also conduct various seminars where I, and other speakers, instruct Municipal, county, State and Federal Law Enforcement Officers in the United States and in Canada in various drug enforcement investigative techniques, drug identification, preparation of search warrant affidavits, planning and execution of search and arrest warrants, and use of confidential informants. In the course of my experience, I have authored numerous affidavits submitted in support of subsequently issued search warrants for drugs and drug related materials. I have personally conducted numerous undercover drug investigations and assisted in countless others. I have executed numerous successful drug and drug-related search warrants and assisted in the execution of others.

2. I am applying for a search warrant at the request of the Rumford Police Department for the CHARLES and SHARON RABON residence and their blue 1998 Ford Winstar [*sic*] van bearing Maine Registration T8ROKE, both situated at 73 Plymouth Avenue in Rumford (Oxford County), Maine to search for cocaine and

other evidence as it pertains to possession, furnishing and/or trafficking of scheduled drugs.

3. In June 2004, a cooperating defendant contacted the Rumford Police Department wishing to share information about drug trafficking occurring in Rumford. This cooperating defendant, herein referred to as "CD", is not on probation but is on bail now for non-drug related offenses. CD is not receiving any remuneration in exchange for this information but has requested prosecutorial consideration *if* any information provided is helpful in a drug trafficking case. (*Affiant Note: CD provided information on additional drug trafficking activities in the area, but only that information that is relevant to this case is described here*). The following is a summary of the information provided:

a. That a white male known as "CHUCK" resides in a blue apartment building on Plymouth Avenue in Rumford with his wife SHARON;

b. That CHUCK drives to Florida three or four times per year to pick up a large amount (approximately 2 kilograms) of cocaine and brings it back to his home in Rumford for distribution;

c. When CHUCK returns to Rumford with the cocaine, CHUCK distributes most of his cocaine to local dealers so they can sell for him;

d. That CHUCK owns and operates a karaoke music business at local bars including Jack's Place in Rumford and Tommy Guns' in Mexico. It is at these bars that most of CHUCK'S cocaine is distributed;

4. After receiving this information, Sgt. Tracey Higley and other Rumford Police Officers attempted to corroborate as much of CD's information as possible. The following is what the officers were able to corroborate:

a. That the blue apartment building on Plymouth Avenue in Rumford is situated at 73 Plymouth Avenue. Registration plates on vehicles parked in the vicinity of this address included one on a blue van registered to CHARLES and SHARON RABON. (*Affiant Note: This corroborates CD's information described in paragraph 3a*);

b. That Jack's Place in Rumford and Tommy Guns' in Mexico are two bars that are well known by the Rumford Police and Maine Drug Enforcement Agency as having cocaine trafficking occurring there on a regular basis. (*Affiant Note: This partially corroborates CD's information described in paragraph 3d*).

5. On August 11, 2004, CD returned to the Rumford Police with new/updated information pertaining to CHUCK and his cocaine trafficking activities. The following is a summary of that information obtained by Sgt. Tracey Higley and Lt. Wayne Gallant of the Rumford Police:

a. That CHUCK's full name is CHARLES RABON and his wife is SHARON RABON. They live together on Plymouth Avenue and their home phone number is (207) 369–9935;

b. Last week, CHARLES and SHARON RABON took their blue van and drove to Florida. They will be coming back to Rumford within one—two weeks with approximately 2 kilograms of cocaine;

c. (*Affiant Note: CD also identified one of the individuals that is selling cocaine for CHARLES RABON. The name of this individual is not identified here since premature release of that information will hinder further investigation.*);

d. That CHARLES RABON recently got summonsed by Rumford Police for excessive noise and at the time of that violation, CHARLES RABON had approximately 10 packages of cocaine in his possession that he intended on distributing. The cocaine was not seized by the police because there was never a search;

6. After receiving this updated information, Sgt. Higley and other Rumford Police officers attempted to further corroborate the information provided as best as possible. The following is what the officers have been able to corroborate:

a. That CHARLES RABON and SHARON RABON do live at 73 Plymouth Avenue in Rumford and their telephone number is (207) 369–9935. This information was confirmed by law enforcement observations (*a prior complaint at this addressed [sic] for a loud party resulted in the confirmation that CHARLES RABON lives at the suspect address*) and by telephone company records provided by AT & T. (*Affiant Note: This corroborates CD's information described in paragraph 5a*);

b. That CHARLES and SHARON RABON own a blue 1998 Ford Winstar [*sic*] Van bearing Maine Registration plate T8ROKE, confirmed by Maine Bureau of Motor Vehicles. Rumford Police checked the area of CHARLES and SHARON RABON's home everyday since August 11, 2004 and has confirmed that this blue van has not been present. (*Affiant Note: This partially corroborates CD's information described in paragraph 5b*);

c. That on May 21, 2004, Rumford Police stopped CHARLES RABON in Rumford and summonsed him for Unnecessary Noise. No search was conducted. (*Affiant Note: This corrobo-rates CD's information described in paragraph 5d*).

7. On August 13, 2004 at approximately 7:20 a.m., CD contacted Sgt. Higley again to provide updated information. The following is a summary of that information:

a. That CHARLES and SHARON RABON have recently left Florida and are presently en route back to Rumford in the blue van and are transporting the cocaine. They will be traveling North-bound on Interstate 95 to the Auburn, Maine exit and then traveling to Rumford from there. They are due back in Rumford sometime today (August 13, 2004);

8. At approximately 7:30 a.m., Rumford Police Officer James Bernard drove past the CHARLES RABON residence again and re-confirmed that the blue van was not present. Sgt. Higley then notified your Affiant and updated me as to the facts and circumstances of the case. We decided that the best course of action was to transmit a teletype to Maine State Police Turnpike units requesting a "be on the lookout" for the suspects and their van traveling Northbound towards Rumford today and request that the vehicle be stopped for a search.

9. At approximately 11:21 a.m., while en route to the Maine Drug Enforcement Agency office in Rumford to send out the alert, I was notified by Rumford Police Sgt. Higley that the suspect vehicle had just arrived at 73 Plymouth Avenue in Rumford. After conferring with Assistant Attorney General David Fisher, we agreed that probable cause existed to justify a search warrant for the vehicle and residence. Based upon that assessment, I asked Rumford Police Officers to go to the CHARLES and SHARON RABON residence to secure the scene pending application of a search warrant.

10. At approximately 11:58 a.m., Sgt. Stacy Carter of the Rumford Police arrived at the front door of CHARLES and SHARON RABON's residence and knocked. SHARON RABON came to the front door and opened it.[10] Immediately upon seeing Sgt. Carter standing there, she turned and ran through the kitchen toward a back room. Fearing that evidence would be destroyed or that SHARON RABON would arm herself with a weapon, Sgt. Carter ran after SHARON RABON into a hallway off the kitchen[.] Upon reaching her, Sgt. Carter noticed in a room off to his side was CHARLES RABON sitting at a desk with a set of drug scales and a large container of white powder that resembles cocaine that he was scooping onto the scale. Sgt. Carter and other officers immediately took CHARLES and SHARON RABON into custody and upon verifying nobody else was in the apartment, secured the scene.

11. Presently, law enforcement officers are standing by at the CHARLES and SHARON RABON residence guarding the apartment and the vehicles in the driveway pending issuance of a search warrant.

12. By virtue of the previously corroborated information provided by CD and today's events, I believe that probable cause exists to justify the issuance of a search warrant for the CHARLES and SHARON RABON residence in Rumford to search for and seize evidence of cocaine trafficking. Since I know that drug traffickers often keep incriminating evidence concealed in vehicles and outbuildings at or near their home, and since I believe that I have probable cause to search CHARLES and SHARON RABON's blue van used to transport cocaine from Florida to Rumford, I further request that the search warrant authorize officers to search any and all vehicles, including the blue van, and outbuildings under CHARLES and/or SHARON RABON's control for evidence of cocaine trafficking. Further, I know it to be common for drug traffickers to keep records of drug sales and records of drug debts on computers, books and other record-keeping devices. Based upon this, I request authorization to search for any such records/equipment.

13. **WHEREFORE, I**, Special Agent Tony L. Milligan, your affiant, pray that a warrant may issue authorizing a search of above-described residence, outbuildings, and vehicles under CHARLES and/or SHARON RABON's control at said residence for the above described property and/or evidence and, that if said property and/or evidence or any part of the same be found there, that it be seized. I hereby swear under oath that the information set forth in this affidavit is true and correct to the best of my knowledge, information, and belief, and that I make this oath under pains and penalties of perjury.

s/s⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯.

Tony L. Milligan
Special Agent
Maine Drug Enforcement Agency
Dated: August 13, 2004

ALEXANDER, J., concurring.

[¶ 37] I concur that we must vacate the denial of the motion to suppress. I write separately because I do not concur in the Court's opinion that probable cause to search was not sufficiently established because the information obtained through the confidential informant was not suffi-

---

10. At the suppression hearing, the arresting officers testified that Sharon Rabon had not opened the door after they knocked, but that one officer had spotted a woman peek through the blinds of a window, shout a profanity, and run to the back of the apartment. The motion justice found that this is what happened.

ciently corroborated. I concur with the probable cause and corroboration analysis stated by the Chief Justice in dissent.

[¶ 38] Although probable cause to search was sufficiently established without reliance on evidence obtained in the illegal entry, I would vacate because the State failed to meet its burden to establish that discovery of the illegally seized evidence was inevitable. *See Nix v. Williams*, 467 U.S. 431, 444, 104 S.Ct. 2501, 81 L.Ed.2d 377 (1984) (noting that the prosecution has the burden to prove inevitable discovery by a preponderance of the evidence).

[¶ 39] The Maine Constitution protects Maine people from illegal home invasions and searches and from seizures of evidence from homes that have been entered illegally. The Maine Constitution states:

> The people shall be secure in their persons, houses, papers and possessions from all unreasonable searches and seizures; and no warrant to search any place, or seize any person or thing, shall issue without a special designation of the place to be searched, and the person or the thing to be seized, nor without probable cause—supported by oath or affirmation.

ME. CONST., art. I, § 5.

[¶ 40] The protections of article I, section 5, and the concurrent protections of the Fourth Amendment of the United States Constitution, cannot be easily circumvented by illegally seizing evidence then asserting that its discovery, by legal means, was "inevitable." Our constitutional protections for person and home can be avoided only for special, narrowly construed purposes, and then, only when justified by a high quality of evidence. As the Second Circuit recently observed: "the inevitable discovery doctrine is available only where there is a high level of confidence that each of the contingencies required for the discovery of the disputed evidence would in fact have occurred." *United States v. Heath*, 455 F.3d 52, 55 (2nd Cir.2006).

[¶ 41] In this case, the police and the prosecutor, at approximately 11:20 A.M., commenced the process to obtain a warrant to search the Rabons' home. A half-hour later, without a warrant, five officers appeared at the Rabons' home to "secure the premises." Immediately, and for reasons that are not clear, the police knocked on the door. Looking through a window and seeing one defendant express shock at the police presence, the police entered through an unlocked door, chased Sharon Rabon through the apartment, and apprehended her after kicking open a bathroom door. Charles Rabon was arrested in another room where he was found with white powder and a digital scale. After the arrest, the Rabons were handcuffed. The apartment was searched, and photos were taken. The police did not obtain a warrant to search the apartment until five hours later.

[¶ 42] The Superior Court correctly analyzed the law regarding warrantless searches. It observed that: "warrantless searches are *per se* unreasonable and it is the State's burden to prove any exception to the warrant requirement." The court further observed that: "In order for a warrantless entry to be legal, there must be both probable cause and exigent circumstances." The court then found that the exigent circumstances alleged in this case—purported concern that evidence might be destroyed—"was created by the police going to the residence and knocking on the door." The court then concluded that this justification was "not a sufficient basis for a warrantless entry." After citing to a decision, which noted that exigencies of law enforcement's own creation do not justify warrantless searches, the court found as a fact that: "[U]nder the circum-

stances of this case the entry by police was illegal." The evidence in the record amply supports the court's finding of an illegal entry.

[¶ 43] Despite concluding that the entry was illegal, the court declined to suppress the evidence seized in the apartment because it applied the inevitable discovery exception to the exclusionary rule. By doing this, the court erred because it did not impose upon the State the heavy burden that our Constitution requires to justify an otherwise illegal seizure of evidence.

[¶ 44] The First Circuit, in a case originating in Lewiston, outlined a three-step analytical framework for examination of inevitable discovery claims, with the prosecution bearing the burden of proof on each point:

> In evaluating inevitable discovery claims, we ask three questions: first, whether the legal means by which the evidence would have been discovered was truly independent; second, whether the use of the legal means would have inevitably led to the discovery of the evidence; and third, whether applying the inevitable discovery rule would either provide an incentive for police misconduct or significantly weaken constitutional protections.

*United States v. Almeida,* 434 F.3d 25, 28 (1st Cir.2006); *see also United States v. Pardue,* 385 F.3d 101, 106 (1st Cir.2004).

[¶ 45] We have indicated that evidence may be admitted pursuant to the inevitable discovery doctrine if the prosecution proves two criteria: first, the information in the application for the search warrant that is independent of illegally obtained information must be sufficient to provide probable cause to support the issuance of the warrant, and, second, the independent information would have inevitably led to discovery of the evidence through lawful means. *State v. Storer,* 583 A.2d 1016, 1019–20 (Me.1990).

[¶ 46] Whether we apply the First Circuit's three-step analysis or our two-step analysis, the first two steps of either analysis are similar and hold the keys to this case. The third step of the First Circuit's analysis is an important reminder of the significance of the constitutional protections at issue and the caution with which the inevitable discovery doctrine must be applied.

[¶ 47] I concur with the Chief Justice that the record supports the trial court's finding regarding the first element of the inevitable discovery doctrine. The information supporting the issuance of the warrant, independent of the information derived from the warrantless entry, demonstrates sufficient probable cause to justify issuing a warrant. In this analysis, it is notable that the five-hour delay in issuing the warrant demonstrates that the District Court carefully and deliberately considered the warrant request. That careful and deliberate consideration suggests that the District Court viewed the question as close, and that its decision to issue the warrant may have been influenced by the information derived from the warrantless search of the apartment. However, respecting our deferential standard of review, there is sufficient support for the Superior Court's finding that the "independence" element necessary to support the inevitable discovery doctrine has been demonstrated.

[¶ 48] There is insufficient evidence, however, to support the second element that "use of the legal means would have inevitably led to the discovery of the evidence." *Almeida,* 434 F.3d at 28; *Storer,* 583 A.2d at 1019–20. Pursuant to *Nix,* 467 U.S. at 444, 104 S.Ct. 2501, the prosecution must prove the elements of the inevitable discovery doctrine by a preponderance of

the evidence. Applying the preponderance of the evidence standard to inevitable discovery cases, however, requires a higher standard of quality of evidence. This derives from the conceptual difficulty of proving inevitability to a probability.[11] Thus, while recognizing *Nix*, the Second Circuit has held that "the government cannot prevail under the inevitable discovery doctrine merely by establishing that it is more probable than not that the disputed evidence would have been obtained without the constitutional violation." *Heath*, 455 F.3d at 58–59 & n. 6 (citing *United States v. Cabassa*, 62 F.3d 470, 472–73 (2nd Cir. 1995)). Similarly, the First Circuit requires that inevitability must be demonstrated "to a high degree of probability." *Almeida*, 434 F.3d at 29; *United States v. Rogers*, 102 F.3d 641, 646 (1st Cir.1996).

[¶ 49] *Heath* involved application of the inevitable discovery doctrine when probable cause to support an arrest was discovered seconds or minutes after an arrest without probable cause. 455 F.3d at 53–54. The District Court had suppressed evidence, and the case was presented on the government's interlocutory appeal. *Id.* at 54–55. In a divided opinion, the Second Circuit remanded for findings on the inevitability issue. *Id.* at 62. A concurring and dissenting opinion by Judge Cabranes

argued that application of the "high level of confidence" standard was inappropriate for a case involving proof of inevitability relating to discovery of probable cause to arrest. *Id.* at 63–64. The separate opinion asserted that the higher standard of evidence is "more appropriately limited to those cases in which the police have engaged in a warrantless search of property otherwise unsupported by any exception to the warrant requirement." *Id.* at 63.

[¶ 50] Judge Cabranes emphasized the importance of application of the higher standard of evidence to closely limit incentives to enter homes without a warrant.

> I do not doubt that *Cabassa* and its progeny set forth a reasonable approach for those circumstances in which the police have entered into a home without a warrant. Indeed, prior cases have indicated that courts view warrantless property searches with suspicion and thus require a showing that the police had taken tangible steps to ensure that they inevitably would have obtained a warrant from a neutral and detached magistrate.

*Id.*[12]

[¶ 51] *Cabassa*, like the instant case, involved a warrantless entry to a home and

---

11. The conceptual difficulty of applying the preponderance of the evidence, or "more likely than not" standard to proof of inevitability, has been addressed as follows:

> There are, of course, semantic problems in using the preponderance of the evidence standard to prove inevitability. To say that more probably than not event "X" would have occurred is to say only that there is a 50% + chance that "X" would have occurred. Clearly, the doctrine of inevitable discovery requires something more where the discovery is based upon the expected issuance of a warrant. Otherwise, it would result in illegally seized evidence being received when there was a 49% chance that a warrant would not have issued or would

not have issued in a timely fashion, hardly a showing of inevitability. Given the present facts, we need not probe further into the semantic puzzle other than to note the difference between proving by a preponderance that something would have happened and proving by a preponderance that something would inevitably have happened.

*United States v. Cabassa*, 62 F.3d 470, 474 (2nd Cir.1995).

12. To support his point that the higher standard of evidence should apply, but only to inevitability questions arising from warrantless entry of homes, Judge Cabranes cited a number of other opinions applying the higher standard to warrantless entry cases:

seizure of evidence while other officers were seeking, but had not obtained a warrant. 62 F.3d at 472. Although the draft affidavit supporting the warrant demonstrated probable cause, the court, applying the higher standard of evidence, determined that there was "some room for disagreement" and "a residual possibility" that the magistrate would have declined to issue the warrant.[13] *Id.* at 473–74. Accordingly, the court overturned the District Court's finding of inevitable discovery and declared the evidence inadmissible. *Id.* at 474.

[¶ 52] The quality of evidence supporting inevitability of legal discovery of the evidence at the Rabons' home satisfies neither the Second Circuit's "high level of confidence" test, nor the First Circuit's "high degree of probability" test. Instead, the State's evidence presents a logical inconsistency. If it was essential to send five officers to prevent disappearance of the Rabons or the contraband before a warrant could be obtained, then it cannot be inevitable that the Rabons and the contraband would have been at the apartment

five hours later when the warrant was obtained.

[¶ 53] The trial court recognized that it was the State's obligation to prove inevitably. Other than the conclusion that the discovery of the contraband was inevitable, however, the court made no findings and the State offered no proof regarding inevitability. Despite the evidence that it was necessary to secure the premises before the warrant issued, both the State and the court seem to have presumed that once the Rabons arrived at their apartment, they and the contraband would have remained at the apartment until the authorities had obtained their warrant. Even the facts found by the trial court do not support such a presumption.

[¶ 54] The trial court found that, shortly before noon, five Rumford officers, some in uniform and at least one wearing a protective vest, appeared "at the [Rabons'] residence" in order to "secure the premises pending the issuance of a warrant." It is quite a stretch to speculate that this heavy police presence would not have been ob-

Courts require these detailed showings of "each of the contingencies" involved, *see* [*United States v.*] *Lavan,* 10 F.Supp.2d [377,] 389 [ (S.D.N.Y.1998) ], precisely because they do not wish to encourage officers to "obviate" or "nullif[y]" the Fourth Amendment's warrant requirement by baldly asserting that they inevitably would have had the probable cause needed to obtain a warrant. *See, e.g., United States v. Mejia,* 69 F.3d 309, 320 (9th Cir.1995) ("[T]o excuse the failure to obtain a warrant merely because the officers had probable cause and could have obtained a warrant would completely obviate the warrant requirement."); *United States v. Brown,* 64 F.3d 1083, 1085 (7th Cir.1995) ("To say that a warrant is required for a search is to say that the police must get judicial approval before acting. Yet if probable cause means that discovery is inevitable, then the prior approval requirement has been nullified."); *United States v. Cherry,* 759 F.2d 1196, 1205 (5th Cir.1985) ("When the police forego legal

means of investigation simply in order to obtain evidence in violation of a suspect's constitutional rights, the need to deter is paramount and requires application of the exclusionary rule."); *cf. United States v. Eng,* 971 F.2d 854, 860 (2d Cir.1992) (noting that "special care is required on the part of a district court when the government relies on the subpoena power" in light of "the need to prevent the inevitable discovery exception from swallowing the exclusionary rule").
*United States v. Heath,* 455 F.3d 52, 64 (2nd Cir.2006).

13. No warrant issued in *Cabassa,* because, after the illegal entry, the DEA agents told Cabassa that he should cooperate as a warrant was about to issue, thereby obtaining Cabassa's consent to a search and subsequently halting the warrant preparation process. 62 F.3d at 472.

served at some time over the next five hours, and that the Rabons, observing the police presence, might not have taken some steps to separate themselves from the contraband or from the premises. Even without the observed police presence, it is also a stretch, inconsistent with the "high degree of probability" standard of evidence, to speculate that the Rabons and the contraband, having arrived at the apartment sometime after 7:30 A.M., would "inevitably" have remained there until sometime after 5:00 P.M.

[¶ 55] "Fact-finders must rely on evidence, not speculation, in fact-finding, and we must vacate decisions where fact-finding was unsupported by evidence." *Hannum v. Bd. of Envtl. Prot.*, 2003 ME 123, ¶ 15 n. 6, 832 A.2d 765, 770. When a party has the burden of proof by a preponderance of the evidence, the "mere possibility" that a fact might be proved is not enough, and "when the matter remains one of pure speculation or conjecture, or even if the probabilities are evenly balanced, a defendant is entitled to a judgment." *Merriam v. Wanger*, 2000 ME 159, ¶ 8, 757 A.2d 778, 780–81 (quoting *Crowe v. Shaw*, 2000 ME 136, ¶ 10, 755 A.2d 509, 512).

[¶ 56] The court's conclusion of inevitability of the legal discovery of this evidence is speculation, unsupported by any evidence in the record. Basically, the court is bootstrapping the fact that the contraband was discovered upon the illegal entry at noon to infer that, but for the illegal entry, the contraband would have remained in the apartment, inevitably, after 5:00 P.M. The strictures imposed by our Constitution to protect persons and their homes from illegal searches cannot be so easily avoided. The contraband in this case was obtained in a search based on a created exigency that the trial court found was an illegal search. The State failed to meet its

burden to prove inevitability of discovery by legal means.

SAUFLEY, C.J., with whom CLIFFORD, J., joins, dissenting.

[¶ 57] I must respectfully dissent. The Court's opinion today, concluding that probable cause for a search cannot be based on information provided solely through a confidential informant without "something more," operates to restrict the State's ability to stop the flow of illegal drugs into the State of Maine, and goes beyond the measures necessary to protect citizens from unreasonable searches and seizures.

[¶ 58] Let us be clear-eyed about the crimes alleged here. The criminal importation of drugs into the State of Maine, and the subsequent sale of those drugs, are activities that are not likely to be undertaken in such a way that the actual crime will be observed by law enforcement or others not involved in the purchase and sale of drugs. Similarly, those involved in the drug trade are not likely to share information on drug activity with law enforcement when such cooperation does not somehow benefit them. The police should be able to rely on corroborated information provided by informants who are close to drug dealers, to aid the State's efforts to interdict the drug trade.

A. Probable Cause

[¶ 59] Because I agree with the Court that probable cause is required to apply any of the legal theories presented by the State in support of the admission of the evidence at issue, I begin where the Court has ended: with the analysis of probable cause. Also, because we do not need to reach the motion court's determination that the officers' entry into the Rabons' home to "secure" the premises was illegal, I assume that the paragraphs in the affida-

vit that provide facts derived from that illegal search must be stricken.[14] Thus, I approach the review of the affidavit in the same way that the Court has, with the offending paragraphs redacted.

[¶ 60] The Court's probable cause analysis can be summarized as follows. A confidential informant provided the police in the Town of Rumford with substantial information regarding the Rabons' personal involvement in the importation and subsequent sale of large quantities of cocaine in Maine. Law enforcement officials corroborated almost every aspect of the objective information given to them by the informant related to the Rabons' lives and activities. However, because the law enforcement officials did not detail the source of the confidential informant's information, present information independent of the informant, or recount a direct observation of the transportation, packaging, and sale of the cocaine, the Court has concluded that the affidavit in support of the search warrant could not support a probable cause determination. Accordingly, all of the evidence found at the Rabons' residence during the execution of the warrant, including cocaine, drug paraphernalia, scales, guns, and money, must now be excluded as evidence against them.

[¶ 61] It is my opinion that the Court has, in effect, returned to the long since rejected formulaic approach required in *Aguilar v. Texas*, 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964), and *Spinelli v. United States*, 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969), by requiring that information regarding criminal activity provided by a confidential informant be supported by *independent evidence* of criminal activity, or perhaps, detailed information about the informant's own activities.

[¶ 62] The Court, properly citing *Illinois v. Gates*, 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983); *State v. Wright*, 2006 ME 13, ¶ 8, 890 A.2d 703, 705; and *State v. Higgins*, 2002 ME 77, ¶ 20, 796 A.2d 50, 56, recognizes the appropriate standards for evaluating an affidavit in support of probable cause for a warrant. The Court also acknowledges that the informant before us provided detailed information that was corroborated by the police, and that the seminal United States Supreme Court case on informants, *Gates*, involved an *anonymous* written tip, through which the stark facts of the defendant's travel to and from Florida was sufficient to corroborate the informant's other information.

[¶ 63] Nonetheless, the Court declares that the affidavit before us is lacking. It does so by parsing through the affidavit and indicating those areas where more information would have been desirable. It requires more information about the informant, even though the informant in *Gates* was completely anonymous. It declares that the Rabons' return from Florida was not "contextually suspicious," and ultimately determines that although the investiga-

14. Because we have not undertaken an analysis of the motion court's conclusion regarding the legality of the officers' entry to secure the residence, nothing herein should be understood to opine on that issue. I note, however, that the officers' actions may have been in reliance on the MAINE LAW ENFORCEMENT OFFICER'S MANUAL, which infers that officers, in anticipation of a warrant, are justified in securing a residence from the inside and from the outside. JOHN N. FERDICO, MAINE LAW ENFORCEMENT OFFICER'S MANUAL 8–19 (2003–2005 ed.). The MANUAL interprets *Segura v. United States*, 468 U.S. 796, 104 S.Ct. 3380, 82 L.Ed.2d 599 (1984), and *Illinois v. McArthur*, 531 U.S. 326, 121 S.Ct. 946, 148 L.Ed.2d 838 (2001), to allow an internal securing of premises in anticipation of a warrant in the same circumstances when a perimeter stakeout is justified. FERDICO at 8–19. We do not address the legality of these methods in the present case.

tion was promising, "something more" was needed.

[¶ 64] In so doing, the Court effectively abandons the "totality of the circumstances" test and "positive reading" requirement we have adopted, based on opinions of the United States Supreme Court. *See Wright,* 2006 ME 13, ¶ 8, 890 A.2d at 705; *State v. Knowlton,* 489 A.2d 529, 531–33 (Me.1985) (adopting the Supreme Court's holding in *Gates* and requiring a positive reading of affidavits); *see also Massachusetts v. Upton,* 466 U.S. 727, 733, 104 S.Ct. 2085, 80 L.Ed.2d 721 (1984) (per curiam) (rejecting "grudging" or "negative" readings of search warrants); *Gates,* 462 U.S. at 230–32, 103 S.Ct. 2317 (adopting the totality of the circumstances test). In its place, the Court substitutes an inflexible requirement that any affidavit in support of a warrant that relies on a confidential informant must contain either detailed information regarding the informant's personal involvement with the subject of the investigation or evidence of criminal activity independent of that supplied by the confidential informant. Neither we nor the United States Supreme Court demand such a rigid or hyper-technical review of an affidavit in support of probable cause. *See Gates,* 462 U.S. at 232–35, 103 S.Ct. 2317.

[¶ 65] As the Court has acknowledged, there is a substantial body of law directed at the question of the reasonableness of searches that are based upon information provided by confidential informants. We should begin our analysis with the application of common sense rather than the "hyper-technical parsing" of a document characteristic of a lawyer's or judge's training and experience. *See id.* at 231, 235–36, 103 S.Ct. 2317. The United States Supreme Court has made it clear that we should avoid hard and fast rules, such as this Court's apparent new rule requiring information on the confidential informant's basis of knowledge or evidence of criminal activity independent of that provided by the confidential informant. Instead, in our reviews, we should encourage motion courts to rely on "factual and practical considerations of everyday life on which reasonable and prudent [persons rely], not legal [technicalities]." *Id.* at 231, 103 S.Ct. 2317 (quoting *Brinegar v. United States,* 338 U.S. 160, 175, 69 S.Ct. 1302, 93 L.Ed. 1879 (1949)); *see also State v. Dignoti,* 682 A.2d 666, 670 (Me.1996).

[¶ 66] The Supreme Court's opinions in *Alabama v. White,* 496 U.S. 325, 110 S.Ct. 2412, 110 L.Ed.2d 301 (1990), and *Gates* demonstrate that an informant's information can be sufficiently corroborated to justify a stop or search when the informant identifies the vehicle that may be used in a crime, those who may use the vehicle, and the future itinerary of the vehicle. *See White,* 496 U.S. at 331–32, 110 S.Ct. 2412; *Gates,* 462 U.S. at 244–45, 103 S.Ct. 2317. *White* and *Gates* support a motion court's inference that if an informant is shown to be right about some things such as identity, vehicle, timing, and route of travel, the informant " 'is more probably right about other facts,' " including the claim that the participants in the trip are engaged in criminal activity. *Gates,* 462 U.S. at 244, 103 S.Ct. 2317 (quoting *Spinelli,* 393 U.S. at 427, 89 S.Ct. 584). Beyond the corroboration of an informant's facts, the United States Supreme Court does not require that a warrant affidavit include independent evidence of criminal activity or evidence on the informant's personal activities to support a finding of probable cause. Nor should we. *See State v. King,* 1998 ME 60, ¶ 9, 708 A.2d 1014, 1017 (stating that we are bound by principles enunciated by the United States Supreme Court in matters of federal constitutional law).

[¶ 67] The purpose of a search warrant is not to prove the *existence* of criminal activity, but rather to ensure that the reasonableness requirements of the Fourth Amendment are effectuated. U.S. CONST. amend. IV; *see Illinois v. McArthur*, 531 U.S. 326, 330, 121 S.Ct. 946, 148 L.Ed.2d 838 (2001). In my opinion, the affidavit at issue contains more than sufficient information to provide probable cause to issue the warrant and to thereby assure the reasonableness of the search. Put another way, it is difficult to determine how the following information, properly catalogued and presented to a magistrate, would make a search of the Rabons' residence unreasonable.

[¶ 68] At the risk of repetition, I summarize the affidavit. The confidential informant, referred to by the Maine Drug Enforcement Agency as a cooperating defendant, CD, was known to the police and was on bail from a non-drug related crime. CD contacted the Rumford Police with information about the drug-running activities of "Chuck" Rabon and his wife, Sharon. He told them where the Rabons live, that Chuck drives to Florida three or four times a year to pick up approximately two kilograms of cocaine, and that he returns with the cocaine to Rumford for distribution. CD gave the police specific information about where Chuck works and indicated that the cocaine is distributed at those places of business. The police corroborated the residential information provided by CD. The police also confirmed CD's information regarding local law enforcement's belief that drug sales were occurring at Chuck Rabon's places of business.

[¶ 69] CD demonstrated substantial knowledge of Charles Rabon's activities when he reported that Rabon had recently been summonsed by the Rumford police for an excessive noise violation. This information was also confirmed independently. CD further indicated that, at the time Rabon had been summonsed by the Rumford police, he was in actual possession of a large quantity of cocaine. Because Rabon was not searched at the time, this cocaine was not discovered.

[¶ 70] CD eventually gave the police information about the Rabons' latest trip to Florida, and the police confirmed that the Rabons' van, previously seen regularly in their driveway, was now gone. CD told the police the day that the Rabons would arrive back in Maine with the cocaine. The police alerted other law enforcement and confirmed the arrival of the Rabons back at their Rumford residence, as predicted by CD. On the very date that the Rabons returned to Maine, the police sought a warrant to search the home, thereby proposing to search the home immediately upon the Rabons' arrival when it was most likely that the cocaine would still be at their house.

[¶ 71] Any magistrate receiving the information above would be required to apply the standards articulated by the United States Supreme Court to determine whether "there is a fair probability that contraband or evidence of a crime" would be found at the Rabons' residence on the date in question. *Wright*, 2006 ME 13, ¶ 8, 890 A.2d at 705 (quoting *Higgins*, 2002 ME 77, ¶ 20, 796 A.2d at 56); *see Dignoti*, 682 A.2d at 670.

[¶ 72] A magistrate reviewing the affidavit would have information demonstrating that the authorities were able to independently confirm much of what was given to them by the confidential informant. This information regarded the Rabons' identities and activities, including their real names, their residence, their vehicle, their travels, and when they were and were not present. The information also related to places where cocaine trafficking was known to be occurring "on a regular ba-

sis." This information was sufficient to establish the confidential informant's *bona fides*. The extent, detail, and corroborated nature of the information provided by CD would lead a reasonable person to conclude that there was a "fair probability" that cocaine would be found in the Rabons' home on the date of the search.

[¶ 73] The Court's analysis, resulting in the opposite conclusion, bears similarity to the analysis of an affidavit addressed by the United States Supreme Court in *Upton*. In *Upton*, a search warrant for the suspect's motor home was issued based on an informant's statements that the motor home was full of stolen goods, that the suspect intended to move the motor home because the police had recently raided the hotel room of the suspect's stolen goods supplier, that the informant had seen the stolen goods, and that the informant was the suspect's ex-girlfriend and wanted "to burn him." 466 U.S. at 729, 104 S.Ct. 2085. The suspect was able to give a description of the stolen goods that matched items taken in recent burglaries, although the informant did not "specifically state that she saw [the goods] in the motor home." *Id.* at 731, 733, 104 S.Ct. 2085. The only corroborated facts in the warrant affidavit were the location of the motor home, the informant's knowledge of the raid, and the informant's knowledge of the name of the suspect and his girlfriend. *Id.* at 731, 104 S.Ct. 2085. In holding that the warrant violated the Fourth Amendment, the Supreme Judicial Court of Massachusetts reasoned that each corroborated fact in the affidavit related to innocent, nonsuspicious conduct, or was related to a public event. *Id.* at 731–32, 104 S.Ct. 2085. In its own analysis, the United States Supreme Court noted that the Massachusetts court had "insisted on judging bits and pieces of information in isolation," rather than considering the affidavit in its entirety. *Id.* at 732, 104 S.Ct. 2085. The

Supreme Court held that probable cause existed for the warrant because, although "[n]o single piece of evidence [was] conclusive[,] . . . the pieces fit neatly together and, so viewed, support[ed] the Magistrate's determination." *Id.* at 733, 104 S.Ct. 2085.

[¶ 74] Until now, we have never held that stops and searches based on information provided by a confidential informant, when officers have confirmed the credibility of that informant with corroborating information, cannot be justified unless the authorities also present "something more." Nor has the United States Supreme Court ever required "something more" for a search based on such information. I would affirm the motion court's conclusion that the affidavit, once redacted, would have issued upon sufficient probable cause.

## B. Inevitable Discovery

[¶ 75] Because I would conclude that the affidavit, as redacted, provided sufficient probable cause for the issuance of a warrant, I go on to address the motion court's determination that the evidence would have been "inevitably discovered."

[¶ 76] The motion court, having declared the officers' original entry into the Rabons' home illegal, treated the search as a warrantless search. It therefore moved on to consider whether any exception to the warrant requirement existed. The motion court ultimately determined that the inevitable discovery exception provided a basis for a lawful search.

[¶ 77] The inevitable discovery exception to the exclusionary rule allows the use of evidence that has been obtained as a result of a violation of the Fourth Amendment when that evidence "inevitably would have been discovered by lawful means." *Nix v. Williams*, 467 U.S. 431, 444, 104 S.Ct. 2501, 81 L.Ed.2d 377 (1984); *see State v.*

*Storer*, 583 A.2d 1016, 1019–20 (Me.1990). Evidence is admitted pursuant to the inevitable discovery rule only if: (1) the evidence could also be gained from information that is truly independent of illegally obtained information, and (2) the evidence inevitably would have been discovered by such lawful means. *See Storer*, 583 A.2d at 1019–20.[15]

[¶ 78] The inevitable discovery exception has developed as a logical counterpart to the "fruit of the poisonous tree" doctrine, which reaches out to suppress *any* evidence obtained as a result of earlier illegal action on the part of law enforcement. *Nix*, 467 U.S. at 441, 104 S.Ct. 2501. Because one of the primary purposes of the judicially-created exclusionary rule, and its extension through the suppression of evidence gained as the "fruit" of other illegally obtained evidence, has been to deter police misconduct, exceptions to the application of the exclusionary rule have been recognized in instances where separate, legitimate investigatory tools would inevitably have turned up the evidence at issue. *Id.* at 442–43, 104 S.Ct. 2501. The end

result of the application of the inevitable discovery rule is to ensure that "the prosecution is not put in a *worse* position simply because of some earlier police error or misconduct." *Id.* at 443, 104 S.Ct. 2501.

[¶ 79] We recently applied the inevitable discovery doctrine in a situation where a victim's body was recovered as a result of a custodial interrogation that we presumed to be illegal for purposes of the inevitable discovery analysis.[16] *See State v. St. Yves*, 2000 ME 97, ¶ 17, 751 A.2d 1018, 1022–23. There, the police had lawfully and independently gathered the following information prior to any alleged misconduct: (1) the defendant's wife had recently given birth to an infant; (2) the defendant had attempted to obtain food stamps for himself, the infant, and his other daughter, but the infant was nowhere to be seen, and the defendant appeared confused and unkempt; (3) the elder daughter appeared uncared for when the police lawfully entered the defendant's trailer to arrest the defendant's wife; (4) a caseworker had attempted to contact the parents on a

---

15. A third aspect of the inevitable discovery exception has been identified by the First Circuit, which I conclude is embedded in the first two *Storer* elements. *See United States v. Silvestri*, 787 F.2d 736, 744 (1st Cir.1986). That aspect addresses whether the application of the inevitable discovery rule in any particular case before the court would encourage police misconduct or reduce the protections offered by the Fourth Amendment. *Id.* Although the court in *Silvestri* explicitly expressed concern about the impact of the inevitable discovery rule on further police misconduct, it focused its analysis "on the questions of independence and inevitability." *Id.* at 746. Therefore, by its very application, the two-part independence and inevitability analysis assures that police misconduct will not be furthered. As the United States Supreme Court has observed:

A police officer who is faced with the opportunity to obtain evidence illegally will rarely, if ever, be in a position to calculate

whether the evidence sought would inevitably be discovered.... On the other hand, when an officer is aware that the evidence will inevitably be discovered, he will try to avoid engaging in any questionable practice. In that situation, there will be little to gain from taking any dubious shortcuts to obtain the evidence. Significant disincentives to obtaining evidence illegally—including the possibility of departmental discipline and civil liability—also lessen the likelihood that the ultimate or inevitable discovery exception will promote police misconduct.

*Nix v. Williams*, 467 U.S. 431, 445–46, 104 S.Ct. 2501, 81 L.Ed.2d 377 (1984) (quotation marks omitted).

16. In that case, we did not independently review the legality of the interrogation because we determined that the police would have inevitably found the victim's body. *State v. St. Yves*, 2000 ME 97, ¶ 17, 751 A.2d 1018, 1022–23.

number of occasions at their trailer and had heard a child inside, though no adult answered the door; (5) when the police arrived to arrest the defendant's wife, the trailer was cold and filled with refuse, dog feces, and urine; and (6) the defendant and his wife provided conflicting explanations to the police as to the whereabouts of the infant and refused to tell them where the infant could be located. *Id.* ¶ 19, 751 A.2d at 1023.

[¶ 80] Taking this information into account, we held that the victim's body would inevitably have been discovered because, if the police had not discovered the victim's body as a result of the interrogation, they would have checked the defendant's wife's story and found that the victim was not with her grandparents. *Id.* ¶¶ 20–22, 751 A.2d at 1023–24. We therefore concluded that, even without the information obtained by interrogating the defendant, the police would have been able to establish probable cause for a warrant to search the defendant's trailer and, after seeking and obtaining a warrant, inevitably would have discovered the victim's body. *Id.* We concluded, " 'fairness can be assured by placing the State and the accused in the same positions they would have been in had the impermissible conduct not taken place,' and, therefore, the court did not err in determining that the inevitable discovery doctrine saved the evidence from suppression." *Id.* ¶ 22, 751 A.2d at 1024 (citation omitted) (quoting *Nix,* 467 U.S. at 447, 104 S.Ct. 2501).

[¶ 81] In contrast to the search conducted in *St. Yves,* here the challenged evidence was not obtained through an illegal interrogation, and the State *did* obtain a warrant to search the premises. The warrant, however, was tainted by the inclusion of evidence gained through the initial presumed-illegal entry into the Rabons' residence. Thus, the analysis is similar to that used in *St. Yves,* but turns on whether the warrant would have issued without the offending paragraphs.[17]

[¶ 82] As discussed above, I would conclude that the warrant would properly have issued even if the officers had not gone first to the Rabons' home, and even if the paragraphs in the affidavit cataloguing the evidence found in that initial entry had not been added to the affidavit.

[¶ 83] Thus, the remaining question presented is whether the evidence would *inevitably* have been discovered when the warrant was issued, several hours after the Rabons' home was secured, which we presume was an illegal act.

[¶ 84] After hearing the evidence, the motion court found that the evidence would have been inevitably discovered after the search warrant was obtained. In reaching this conclusion, the court heard the evidence presented before it, heard the arguments for both sides, and reviewed the documentary evidence presented. The court could reasonably have concluded that, in the absence of the officers' action in entering the Rabons' residence, the evidence inevitably would have remained at the residence until the search warrant was

17. When the police have, in fact, obtained a warrant, challenges to the search will ordinarily be made in terms of alleged infirmity in the warrant. *See, e.g., Franks v. Delaware,* 438 U.S. 154, 155–56, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978); *Wright,* 2006 ME 13, ¶¶ 6–7, 890 A.2d at 705; *State v. Dickinson,* 2005 ME 100, ¶ 10, 881 A.2d 651, 655–56; *State v. Lehman,* 1999 ME 124, ¶ 1, 736 A.2d 256, 257. If the warrant is determined to be legally infirm, the search will usually be treated as warrantless and the evidence will be suppressed unless there is an exception to the warrant requirement. *See, e.g., United States v. Finucan,* 708 F.2d 838, 841–43 (1st Cir. 1983); *State v. Storer,* 583 A.2d 1016, 1018–20 (Me.1990).

obtained late in the afternoon. This conclusion could be based on reasonable inferences by the court, including the fact that the Rabons had traveled a considerable distance in a relatively short time and that they would have needed some time to organize and to prepare the cocaine before distributing it for resale.

[¶ 85] Moreover, the warrant was issued and executed approximately four-and-one-half hours after the officers' initial entry. Had the police not secured the Rabons' home prior to seeking the warrant, it is very likely that, based on the urgency of the situation, both the police and the court would have acted upon the warrant request much more quickly. Thus, the motion court could infer that it was unlikely that the Rabons and/or the cocaine would have been gone from the apartment and therefore not subject to discovery when the warrant was ultimately obtained. *See United States v. Eng*, 971 F.2d 854, 859 (2d Cir.1992) (stating that proof of inevitability is bolstered by a "close temporal relationship ... between what was known and what had occurred prior to the government misconduct and the allegedly inevitable discovery of the evidence"); *see also Nix*, 467 U.S. at 449, 104 S.Ct. 2501 (noting that, absent the suspect's confession, the body would have been discovered within five hours); *United States v. Whitehorn*, 829 F.2d 1225, 1228, 1232 (2d Cir. 1987) (holding that the inevitability exception applied to an apartment search despite the six-hour delay between the initial search and the issuing of the search warrant).

C. Independent Source

[¶ 86] The same results are obtained if we apply the "independent source" exception to these facts. The independent source exception permits the admission of evidence that was obtained independently through both illegal and legal sources. *Storer*, 583 A.2d at 1019. As the majority acknowledges today, if the magistrate had had probable cause to issue the warrant without the allegedly unlawfully-obtained information, the independent source exception would have allowed the admission of the evidence. Because I would conclude that the magistrate would have had sufficient probable cause to issue a warrant on the redacted facts in the affidavit, I would also conclude that the independent source exception results in the admissibility of the evidence.

[¶ 87] Accordingly, I would affirm the Superior Court's denial of the Rabons' motion to suppress.