STATE OF MAINE                              UNIFIED CRIMINAL DOCKET
AROOSTOOK,ss                                LOCATION: HOULTON
                                            DOCKET: AROCD-CR-15-035


STATE OF MAINE                    )
                                  )
                                  )
                                  )
vs.                               )         DECISION AND ORDER
                                  )         REGARDING DEFENDANT
                                  )         DOBBINS'
                                  )         MOTION TO SUPPRESS
                                  )
                                  )
REGINALD DOBBINS                  )
                                  )


Before the Court is Defendant Dobbins' Motion to Suppress dated January 30, 2017.
Dobbins seeks suppression of all evidence obtained from a search of Dobbins' home
initiated on or about March 4, 2015.[1]Hearing was held on Defendant's motion on
May 19, 2017 at which testimony was received from Assistant District Attorney John
Pluto of the Aroostook County District Attorneys Office and Detective Mitchell of the
Maine State Police. The primary issue raised by Defendant's motion is whether the
bail conditions search initiated by the police on March 4, 2015 was legal. Based
upon the evidence presented and review of applicable law, the court makes the
following findings.


                                    FACTS


On March 1, 2015 Keith Suitter was found dead in his home on Hillview Avenue in
Houlton. The cause of death appeared to be a stabbing and blunt force trauma
prompting a homicide investigation. On March 4, 2015, Detective Mitchell
participated in an interview of Defendant Dobbins. The interview commenced at
Dobbins home but the majority of it was conducted at the Maine State Police
barracks in Houlton. Through the course of the interview of Dobbins, Detective
Mitchell learned that Dobbins was on bail for aggravated assault, which had
conditions of no use or possession of alcohol or drugs or dangerous weapons, and
random searches at any time without articulable suspicion or probable cause. (Def's.
Ex. 1; State's Ex. 3 and 5). And through the course of the interview, Dobbins told
Detective Mitchell that he had smoked marijuana in the last week. (State's Ex. 5).

---

[1] The bail search began just before midnight on March 4, 2015 and was concluded
shortly after midnight on March 5, 2015.

1

Dobbins also told Detective Mitchell that in the early evening of March 1, 2015 his mother had dropped he and Sam Geary off on Hillview Avenue near where the victim Suitter lived, that they walked by his home, and at some point while in the area heard people talking, possibly some yelling. (Id.). In addition, Dobbins told the detective that he had not told his mother the details of what he was planning to do out in that area or who he was planning to meet, a Josh Pike, giving Detective Mitchell the impression that it was something less than legal. And Dobbins told Detective Mitchell that after his meeting Pike and others he and Geary were dropped off near Reservoir Hill, where they called Dobbin's father for a ride. (Id.). Dobbins also told Detective Mitchell he knew Keith Suitter.(Id.)

As the interview was being wrapped up, Detective Mitchell inquired of Dobbins if he would provide a DNA sample, but Dobbins declined. The officers then gave Dobbins a ride home. While driving to Dobbins' residence, the officers discussed completing a bail check, and asked Dobbin's what his thoughts were. Dobbins responded "That's fine." (State's Ex.5, p.162). Although a few moments later Detective Mitchell stated "...you're obviously required to consent to search." (State's Ex. 5, p.164). Once at Dobbins' home, Detective Mitchell initiated the bail search and ultimately found in Dobbins' bedroom a folding knife with red brown stains at the hinge. The detective was also shown by Christie Dobbins the Defendant's trench coat which also had on it red brown stains. Detective Mitchell then ceased further activity and the detectives began the process of securing the scene and obtaining a search warrant.

Although at the time of the bail search Detective Mitchell himself may not have been aware of all other details of the investigation, by that time there was a significant amount of evidentiary information within the collective knowledge of the police. (See State's Ex 4, Search Warrant Affidavit). In summary, prior to conducting the bail search, police had within their knowledge evidence of a homicide, likely involving a knife and blunt instrument, with evidence of blood spatter and transfer. The assailant(s) had likely left in Suitter's pickup until it went off the road on Hillview Avenue. Based on evidence gathered at the scene of the pickup, police had knowledge of two sets of footprints in the snow leaving from the pickup, hence two subjects involved, and there was red brown stain in the interior. Hence, there was likely blood transfer from Suitter at the homicide scene onto the assailants then onto the pickup interior. Defendant Dobbins own mother placed him in the vicinity of the scene of the homicide, her telling police she gave Defendant Dobbins and Geary a ride and dropped them off near 412 Hillview Avenue, and her son telling her they had heard yelling and screaming coming from Suitter's home. Dobbins mother also provided details of her husband later picking them up in their vehicle, the same vehicle seen headed south on Hillview Avenue on store surveillance video footage taken at around 7:44 pm. Lastly Defendant's mother provided a description of certain clothing worn by Dobbins and Geary matching the description given by citizen witnesses. And the citizen witnesses placed two males wearing clothing similar to that as described by Christie Dobbins walking on Hillview Avenue in the vicinity of Suitter's abandoned pickup, one witness thinking the two males were walking to get help for the pickup.

2

As for Dobbins' bail conditions, on September 12, 2014 Dobbins had his initial in-custody appearance for the charge of Aggravated Assault, Class B. At the in-custody proceeding, Dobbins was represented by Lawyer of the Day, Jeff Pickering. By the time of the hearing, the Court had been provided a copy of the complaint, and the probable cause affidavit with bail recommendations. (State's Ex.1). The complaint brought against Dobbins indicated he was charged with aggravated assault with the use of a dangerous weapon, a baseball bat. (Id.). The Bail Recommendation made by the State was: *Surety Bond of $5,000 or cash $500. Release Conditions: No contact with James Schneider, Susan Lannon, Christopher Richardson, Devon Hannigan, and Jacoby Suitter; no possession or use of alcohol or drugs; submit to random search and testing; no possession of weapons; submit to random search for weapons.* (Id.).

Justice Hunter presided at the initial appearance. At the hearing Justice Hunter advised Dobbins of the charge, explained he would not be taking a plea as it was a felony, and described for him the Grand Jury process. (Defendant's Ex. 1). Attorney Pickering who was present as lawyer of the day, was appointed to represent Dobbins going forward. When addressing the issue of bail, Justice Hunter inquired "..to the question of bail, Mr. Pickering. And have you had a chance to consider the State's recommendation here?" (Id. at p. 6, l. 6-8). Attorney Pickering responded "Yes", and then relayed portions of a discussion he had recently had with the prosecutor assigned to the case regarding one particular witnesses named in the no contact conditions. (Id.). As the hearing was concluding ADA Pluto inquired "And the alcohol and drug conditions will be in place?" (Id. at p. 8, l. 2-3). Justice Hunter responded "You're right, all of those requirements." (Id. at l. 4). None of the other conditions were specifically discussed but Justice Hunter did suggest that Attorney Pickering have a discussion about the compliance with bail conditions with Mr. Dobbins. (Id. p. 8, l. 14-15). Ultimately, on September 12, 2014 Defendant Dobbins was bailed and he signed the Bail Bond with the surety amount and release conditions set as originally requested by the State. (Defendant's Ex. 2).


DISCUSSION

In his motion Dobbins challenges the lawfulness of the initial bail check of Dobbins' home which was conducted without a warrant, and further asserts that the search warrant subsequently issued is tainted by the initial bail search, and therefore seeks suppression and exclusion of all evidence obtained from both searches.

1.*Was the Bail Search Legal?*

The validity of a bail search based on a bail condition of random search has previously been addressed by our Law Court. In *State v. Ullring*, 741 A.2d 1065(Me. 1999) the defendant had been arrested on drug charges and was released on bail with a condition of random searches of his person, residence and vehicle. His home

3

was subsequently searched without a warrant and without evidence of wrongdoing at which time drugs were found, leading to additional drug related charges. *Id.*at 1066. Defendant's motion to suppress the evidence obtained from the warrantless search of his home was denied. On appeal, the Law Court acknowledged that the Maine Bail Code allows as a requirement for pre-conviction release a condition that the defendant refrain from the possession of firearms, alcohol or drugs and concluded that a bail condition of random searches is not prohibited by the Maine Bail Code. 741 A.2d at 1070-1071. In addition, the Law Court ruled that by signing the bail bond the defendant sufficiently manifested his voluntary consent to the search of his home. *Id.* at 1068. In reaching its decision, the Law Court carefully considered whether bail conditions of random searches violate Fourth Amendment protections and struck the balance that such a condition authorizing random searches can only meet Fourth Amendment scrutiny if the condition is reasonable under all of the circumstances. *Id.* at 1073. But when a judicial officer imposes a random search condition it can be assumed, in the absence of the evidence to the contrary, that the condition is reasonable. *Id.* The burden is always on the State to show consent to a search, but the State satisfies that burden by proving the existence of a bail condition; the burden of presenting evidence then shifts to the defendant to show the conditions are unreasonable. *Id.*[2]

Dobbins however makes his challenges to the warrantless bail search upon reliance of *United States v. Scott*, 450. F.2d 863, (Court of Appeals Ninth Circuit, 2006). In that case the court held that a drug test of the defendant without probable cause did not pass constitutional muster despite a bail order for such random tests, and further ordered the subsequent warrantless search of the house without probable cause other than that provided by the improper drug test results was also invalid. In *Scott,* the court initiated its analysis with the predicate that Scott's consent to search (vis-a vis the bail agreement with conditions) is only valid if the search in question, taking the fact of consent into account, was reasonable. *Id.*at 868. The court noted that Fourth Amendment reasonableness means a search is supported by probable cause, but may relax these needs when "special needs" exist. *Id.* In short, "special needs" must be a goal or need distinguishable from the general interest of crime control. *Id.* at 869. The court then conducted a thorough review of whether or not the government had established the State of Nevada had special needs for drug-testing release conditions, and found it had not established such special needs.

The Ninth Circuit's ruling based on that analysis is of marginal help to the case at hand, in which Maine has a much different Bail Code, with four factors to consider in setting conditions of release. See Fn. 1, and 15, MRSA §1026(3)(A). The type of

---

[2] Since the *Ullring* decision, the factors for consideration in setting conditions of release pursuant to Section 1026 have expanded from ensuring the appearance of the defendant and the ensuring the integrity of the judicial process to also include ensuring the defendant will refrain from new criminal conduct and ensuring the safety of others in the community. See *Ullring* at 1068, and current 15, MRS §1026(3)(A).

4

analysis done by the *Scott* court applied to Maine's Bail Code could lead to a different result. Under Maine's Bail Code, objectives or goals which are to be considered when setting bail conditions include ensuring the appearance of the defendant, ensuring the defendant will refrain from any new criminal conduct, ensuring the integrity of the judicial process and ensuring safety of others in the community. See 15, MRSA §1002 and §1026. In total, these goals and objectives are reasonable and broader than the only a goal of criminal control.

The court in *Scott* also reviewed whether the search was reasonable under a more general "totality of circumstances" approach. *Scott* at pp. 872-874. In this analysis, the court reviewed the balance of intrusion upon an individual's privacy with promotion of legitimate governmental interests, and made the comparison of probationers versus those on pre-conviction bail. Ultimately, the *Scott* court found that.... *A search of Scott or his house on anything less than probable cause is not supported by the totality of circumstances in this case. Id* at p. 874.

The facts in *Scott* are very distinguishable from those in the case at hand. In *Scott,* relying only upon an informant's tip, and without probable cause, officers went to Scott's home and subjected him to a urine test; when the urine test came back positive, the officers searched his home and found drugs. Other than that urine test, the officers had absolutely no probable cause. Those are extremely different facts than what we have in this case with Defendant Dobbins.

In this case, the police were investigating a homicide. Defendant Dobbins had come to their attention as an individual who was in the vicinity of the crime the evening it occurred and had told his mother he had heard some yelling. Through the course of interviewing Defendant Dobbins, Detective Mitchell became aware Dobbbins had been charged with aggravated assault with use of a dangerous weapon, and was on bail with conditions. At this interview, Dobbins essentially admitted he had recently violated his bail by using drugs(marijuana), and somewhat implied other less than legal conduct vis-a vis his meeting with Josh Pike.

In addition, prior to conducting the bail search, police had within their collective knowledge significant evidentiary information independent of information learned from Dobbins' interview. The police were investigating a homicide, with evidence indicating it involved a knife and blunt instrument, and with evidence of blood spatter and transfer. The assailant(s) had likely left in Suitter's pickup until it went off the road on Hillview Avenue where it was abandoned. Based on evidence gathered at the scene of the pickup, police had knowledge of two sets of footprints in the snow leaving from the pickup, hence two subjects involved, and there was a red brown stain in the interior. Hence, there was likely blood transfer from Suitter at the homicide scene onto the assailants then onto the pickup interior. Defendant Dobbins own mother placed him in the vicinity of the scene of the homicide, her telling police she gave Defendant Dobbins and Geary a ride and dropped them off near 412 Hillview Avenue, and her son telling her they had heard yelling and screaming coming from Suitter's home. Dobbins' mother also provided details of her

5

husband later picking Dobbins and Geary up in their family vehicle, the same vehicle seen headed south on Hillview Avenue in store surveillance video footage taken at around 7:44 pm. Lastly Defendant's mother provided a description of certain clothing worn by Dobbins and Geary matching the description given by citizen witnesses who saw two males in the area. And the citizen witnesses placed two males wearing clothing similar to that as described by Christie Dobbins walking on Hillview Avenue in the vicinity of Suitter's abandoned pickup. Looking at this information in its totality, probable cause existed to believe that Dobbins and Geary were involved, and a fair probability existed, given evidence of blood spatter and weapons used, that a search of Defendant's home would yield evidence of the crime, including but not limited to clothing with blood evidence and a weapon. See *State v. Johndro*, 2013 ME 106.[3]

Unlike the defendant in *Scott* with whom police had no probable cause to search his home, in this case the police already had significant evidence relating Dobbins to the homicide investigation before conducting the bail search. In addition to finding "special needs" had not been established, the court in *Scott* also ruled that the search was unreasonable under the more general "totality of circumstances" approach, as the search of his home was done without probable cause. *Scott* at pp. 872-875. That is not the state of the facts in this matter. Applying the totality of circumstances test adopted by *Illinois v. Gates*, 462 U.S. 213 which Maine follows, for the reasons set forth above there was probable cause to search Defendant Dobbins home on March 4th and 5th, 2015. And, unlike in *Scott*, in this case Detective Mitchell had information received directly from Defendant Dobbins that he had recently violated his bail conditions. The Court does not find that *Scott* is applicable or controlling of the case at hand. Maine's Bail Code sets forth different objectives than were under consideration in *Scott*, and prior to the bail search, Detective Mitchell had reason to believe Dobbins had violated his bail, and the officers investigating Mr. Suitter's death collectively had probable cause to believe Dobbins was involved.

Accordingly, the Court finds that the analysis for determining the reasonableness of a bail search set forth by *State v. Ullring*, 741 A.2d 1065 remains applicable. In that regard, the Court does find that on September 12, 2014, at the initial in-custody proceeding, Justice Hunter set bail as requested by the State. It is clear from the evidence the State requested bail be set at $5000 surety or $500 cash, with release conditions of no contact with five named individuals, and no use or possession of alcohol or drugs and to submit to random search and testing, and no possession of weapons and subject to random search for weapons. Indeed, the no possession of weapons condition with random searching is typical and reasonable for charges of aggravated assault with the use of a dangerous weapon.

The Defendant asserts that since there was no discussion on the record of this condition at the September 12, 2014 hearing, then there is no proof it was actually

---

[3] See discussion in Section 2 regarding the Independent Source Exception and existence of probable cause.

6

ordered and set by the presiding judge, Justice Hunter. The Court disagrees. The evidence includes the written bail recommendation made by the State, which was presented to the Court. (State's Ex. 1). The requested amount of bail and release conditions are clearly indicated. At the hearing, Justice Hunter inquired if the defense had had a chance to consider the State's recommendation for bail. This clearly implies Justice Hunter was himself aware there had been a recommendation. The defense responded "Yes". The fact there may have been no direct discussion by Justice Hunter and the defense about the dangerous weapons conditions does not mean those conditions were not imposed. The bail recommendation with all of the stated release conditions was properly before the court and the Defendant, and inquiry was made whether the defense had reviewed them; the Defendant responded "yes", and then proceeded to discuss only one particular concern, that being one of the five individuals listed for no contact. The Defendant made no objection to any of the other conditions. And, the Defendant in fact signed the Bail Bond containing the very same release conditions as requested.

Following *Ullring,* the Court finds that the bail conditions set on September 12, 2014 were appropriate and reasonable under all of the circumstances. *Ullring* at p. 1073. By signing the Bail Bond, the Defendant consented to a search of his person, vehicle and residence, which consent continued to exist at the time of the bail search on March 4th and 5th, 2015. There has been no evidence offered suggesting the conditions were not reasonable. *Id.* Finally, as was the case in *Ullring,* the Court further finds that the Bail Code allows for random bail searches of a person's residence.

2. *Independent Source Exception*

Assuming for discussion however that the bail search were to be found unlawful, further analysis would be required before evidence be excluded. In this case a search warrant was issued after the bail search. Evidence obtained from either the bail search or subsequent search pursuant to a warrant, or both, may still be admissible pursuant to the Independent Source Exception.

The independent source exception to the exclusionary rule allows admission of evidence which was gained through an independent source as well as the tainted source. *State v. Storer,*583 A.2d 1016 (Me. 1990). It is appropriate in circumstances where a search warrant was issued, but some of the information used to establish probable cause is determined to have been illegally obtained. *State v. Rabon,* 930 A.2d 268,275 (Me. 2007). If the magistrate would still have had probable cause to issue the warrant without the allegedly unlawfully obtained information, the independent source exception allows admission of the evidence. *Id.* To conduct this analysis, the illegally obtained information is excised from the search warrant affidavit, and then a determination is made whether the magistrate would have

probable cause to issue the warrant relying solely on the remaining information. *Storer* at p. 1019.

In determining whether probable cause exists, the totality of circumstances test is applied. *State v. Higgins,* 2002 ME 77; citing *Illinois v. Gates,* 562 US 213. When applying this test a practical, common sense decision is to be made whether, given all of the circumstances set forth in the affidavit, including veracity and basis of knowledge of persons supplying hearsay information, there is a fair probability that contraband or evidence will be found in a particular place. *Higgins,* ¶20. The affidavit must be given a positive reading, and review the affidavit with all reasonable inferences that may be drawn. *Id.* Ultimately, the affidavit must set forth some nexus between the evidence to be seized and the locations to be searched. *State v. Johndro,* 2013 ME 106, ¶ 10. The nexus may be inferred from the type of crime, the nature of the items sought, the extent of an opportunity for concealment and normal inferences as to where a criminal would hide evidence of a crime. *State v. Mariner,* 2017 ME 102, ¶14.

The search warrant affidavit in question is one by Detective Jason Fowler dated March 5, 2015. (State's Exhibit 4). The affidavit contains 15 numbered paragraphs. (although the 15th paragraph actually contains two lengthy paragraphs.) If the bail condition search were deemed illegal, to apply the independent source exception analysis, paragraphs 12 and 13 would be excised in their entirety and all of paragraph 15 except for the initial 24 lines would be excised.[4] From the remaining, unexcised portion of the affidavit, the following information remains. (references will be to the paragraph number of the affidavit. (P._).

On March 1, 2015 at approximately 10 pm an abandoned red pickup owned by Keith Suitter was found located off the road on Hillview Avenue in Houlton, Maine. (P.2,3) Citizen witnesses Desiree Deprey and Emily Polchies found the abandoned truck and called the police. They indicated the pickup belonged to Keith Suitter.(P.4) After the police arrived the citizen witnesses went to check on Suitter, who lived down the road at 412 Hillview Avenue. (P.2, 4) Upon going to Suitter's home, Deprey and Polchies found Suitter on the floor and immediately notified the police. (P.4). Officer Crouse of Houlton Police went to Suitter's home, and found Suitter dead, laying on the floor with a large pool of blood near his head, and it appearing there had been a struggle. (P.4). There was also an odor of raw marijuana. (P.4).

The scene where Suitter had been found in his home was processed by police, and evidence of blood spatter, blood transfer and cast off blood was found. (P.10). It

---

[4] The parties agree that all of Paragraph 12, and everything in Paragraph 15 after line 24 be excised, but the State asserts that Paragraph 13 should survive excision. Had the detectives not conducted the bail search that evening and found the knife, leading the Defendant to become ill, it is likely the Defendant would not have had his mother drive him back to the barracks that evening and the exchange described in Paragraph 13 would not likely have occurred.

appeared to police that Suitter had stab wounds and lacerations and also an indentation in the back of his skull, with what appeared to be brain matter showing. (P.10).

Citizen witness Polchies indicated she had spoken with Suitter by phone that day at 5:20pm. Another citizen witness, Courtney London, indicated she had visited Suitter on March 1, 2015 and left his home at 6:30 pm. (P.5).

At the scene where Suitter's pickup was found, foot prints were found from both the driver and passenger side. (P.9). The driver side foot prints were larger than the passenger side foot prints. (P.9). Red brown stains were found in the interior of the pickup. (P.9).

Citizen Witness Allen Acott was interviewed on March 2, 2015 and told police that on March 1, 2015 between 7:30 and 7:40 pm he was traveling south on Hillview Avenue and met two subjects walking north, both dressed in dark clothing, one about six feet tall and the other three to four inches shorter. (P.6). Acott observed the taller subject was wearing an unzipped, heavy jacket and the shorter was wearing a hooded sweatshirt or jacket. The shorter subject was clean shaven. (P.6). Acott continued south on Hillview Avenue and observed a red Ford pickup stuck in the snowbank of the northbound lane. (P.6). Acott stated he felt the two subjects were walking to get help with their pickup. (P.6).

Citizen Witness Ashley Eastham was interviewed on March 3, 2015 and told the police that on March 1, 2015 at approximately 7:24 pm she was outside her home when she noticed two males walking her direction on Hillview Avenue. (P.7). The taller male had a beard and was wearing a long trench coat. (P.7). The shorter male appeared to be under the influence and was having difficulty walking. (P.7). Eastham could overhear the male subjects talking on a phone, and heard the taller male state "We left Hollywood, we're just hitting Hillview. ..we're just walking up Reservoir Hill. Can you come pick us up?" (P.7).

On March 4, 2015, Citizen Witness Marie Hanson, who lives at 113 Hillview Avenue, told police that on March 3, 2015 she was approached by Christie Dobbins who began speaking with her about the Suitter murder. (P.8). Christie Dobbins told Hanson that she had taken her son and his friend out by Suitter's residence the night of his death, and her son mentioned to her that he and his friend heard yelling and screaming coming from Suitter's. (P.8).

On March 4, 2015, police interviewed Christie Dobbins at her home. (P.11). Christie Dobbins told police that on March 1, 2015 she had provided a ride to her son, Reginald Dobbins and his friend, Sam Geary, to Hillview Avenue and dropped them off near 412 Hillview Avenue. (P.11). Christie Dobbins also told police her son was wearing a black trench coat and Geary was wearing a dark colored hooded sweatshirt. (P.11). Christie Dobbins also told police that later on her husband Reginald Dobbins Sr. picked up her son and Geary. (P.11).

9

While conducting the interview of Christie Dobbins, police observed a Toyota Prius parked in the driveway, with dents on the trunk and passenger side quarter panel. (P.11). Christie Dobbins agreed to turn on the vehicle's lights and step on the brakes, which showed the passenger side lower tail light was out. (P.11). The Dobbins' Prius matched the vehicle seen in the surveillance videos of County Yankee Grocery Store parking lot from March 1, 2015 in the time range of 7:44 to 7:47 pm, and shows the vehicle leaving the parking lot, exiting onto Hillview Avenue headed in a southerly direction. (P. 11,14).

In summary, prior to the bail condition search, police had probable cause to believe Suitter had died as a result result of a homicide with injuries including stab wounds, lacerations and blunt trauma to his head. These injuries produced blood spatter, transfer and castoff, which could likely have been transferred to his assailants. Suitter's red pickup was found abandoned, off the road, with two sets of foot prints, the set from the driver side being larger. Red brown staining was found in the interior of the pickup. There is probable cause to believe that whomever was involved in the demise of Suitter took his vehicle, and headed north on Hillview Avenue until the vehicle went off the road. The red brown stains found in the interior of the vehicle were likely to have been transferred from Suitter to his assailants. And Defendants Dobbins and Geary are both placed in the general area of the scene the evening of March 1, 2015. Christie Dobbins dropped Defendants Dobbins and Geary off near Sutter's residence at 412 Hillview Avenue, and Dobbins told his mother they heard yelling and screaming coming from Suitter's home. Citizen witnesses observed two males fitting the general description of Dobbins and Geary walking northerly on Hillview Avenue, away from the Suitter; the citizen witnesses described two males, one taller than the other, the taller wearing a dark trench coat and the shorter wearing a hooded sweatshirt, the same clothing indicated by Christie Dobbins. One citizen witness indicated he felt the two individuals were walking to get help for the pickup off the road. And one citizen witness provided information of the two males talking on their phone asking for a ride, facts also confirmed by Christie Dobbins and the surveillance videos; and these observations of the two males on Hillview Avenue took place in the time frame of after the last time Suitter was seen alive at 6:30 pm but before his vehicle was found on the side of the road. The above information gathered by police came directly from their observations made at the scene of the homicide and where the abandoned pickup was found, and also from "disinterested" citizen witnesses. See *State v. Johndro*, 2013 ME 106, ¶11; *State v. Mariner*, 2017 ME 102, ¶16.

The excised affidavit supports a finding of probable cause that Suitter died as a result of a homicide and his assailants left his residence in his pickup. There is also probable cause to establish a nexus between the Suitter pickup found on the side of the road, and Dobbins, who was dropped off near and in the immidiate area of Suitter's home that evening and who meets the general description of one of the individuals seen walking away from the abandoned pickup. Were the search warrant affidavit to be excised as indicated, probable cause would still exist to issue

a search warrant. As previously stated, looking at the remaining unexcised information in its totality, probable cause exists to believe that Dobbins and Geary were involved, and a fair probability existed, given evidence of blood spatter and weapons used, that a search of Defendant's home would yield evidence of the crime, including but not limited to clothing with blood evidence and weapons or other instrumentality used in the crime. See *State v. Johndro,* 2013 ME 106.

Accordingly, Defendant's Motion to Suppress is DENIED.

Dated: May 27, 2017

Justice, Superior Court

11